COMMONWEALTH *vs.* LAWRENCE L. ROONEY.

Middlesex.    April 1, 1974. — June 18, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & WILKINS, JJ.

*Practice, Criminal,* Disclosure of evidence, Charge to jury, Capital case. *Homicide. Search and Seizure,* Probable cause. *Husband and Wife,* Consent to search of marital premises.

Upon a claim of error for failure to grant the defendant's motion to dismiss based on the failure of the prosecution to disclose allegedly

exculpatory evidence, where the record on appeal was "devoid of anything which might enable this court to recognize or identify" the allegedly withheld evidence, and the briefs were of limited assistance, the trial court's denial of the motion was held to be proper. [488-489]

The requirement of G. L. c. 278, § 33E, that in a "capital case" this court must examine "the whole case for . . . consideration of the law and the evidence," does not relieve the appealing party from compliance with S.J.C. Rule 1:15 (2), requiring transcript page references for facts stated in briefs. [489, n. 1]

A motion to dismiss for alleged failure of the prosecution to disclose exculpatory evidence was properly denied where in the circumstances it appeared that the defendant's counsel already knew the allegedly exculpatory evidence.[489-491]

There was no merit to the defendant's contention that refusal by the trial judge to order a witness under cross-examination by the defence counsel at the close of the day "not to discuss with anybody this case" constituted prejudicial error. [491-492]

There was no error in the admission of evidence seized in a warrantless search of an automobile parked unlocked on a public street where in the circumstances the search was justified and where the evidence seized was only cumulative. [492-493]

The consent of the defendant's wife to a search of her house was "voluntarily and intelligently" given where it appeared that police informed her of their purpose and of her right not to permit the search, and where she signed a waiver authorizing the search. [493-494]

Where the trial judge had fully instructed the jury on murder and manslaughter, he was not required to add the defendant's requested instruction that if the jury believed that the defendant was knifed, "the knifing would amount to a provocation." [494-495]

INDICTMENT found and returned in the Superior Court on July 9, 1971.

The case was tried before *Coddaire*, J.

*Alfred P. Farese* for the defendant.

*Bonnie H. MacLeod-Griffin*, Assistant District Attorney, for the Commonwealth.

QUIRICO, J. The defendant was tried on an indictment charging him with the crime of murder in the first degree allegedly committed on June 6, 1971. The jury found him guilty of murder in the second degree, and the mandatory punishment of "imprisonment in the state prison for life" was imposed on him. G. L. c. 265, § 2. The case was tried subject to G. L. c. 278, §§ 33A-33H, and it is here on the defendant's appeal.

The case is before us on the following alleged errors: (1) the denial of a motion to dismiss the indictment because of the Commonwealth's alleged failure to disclose exculpatory information before trial; (2) the denial of a request that a prosecution witness be instructed not to discuss the case during a recess in the trial; (3) the denial of an oral motion to suppress an automobile registration plate taken by the police in a warrantless search of an automobile; (4) the denial of an oral motion to suppress a spent shotgun shell obtained from the defendant's wife; and (5) the denial of a request that the judge use a particular illustration in giving additional instructions to the jury.

A summary of the evidence will be helpful in considering the merits of the assignments of error and in reviewing the case under G. L. c. 278, § 33E.

In the early morning hours of Sunday, June 6, 1971, the defendant was at the apartment of Dorothy Cheek in Malden, together with Cheek, Ezra McClain, the victim in this case, and Janet Coviello. The defendant went into a bedroom to lie down and about fifteen or twenty minutes later McClain and Coviello left and returned to their own apartment, also in Malden.

About seven o'clock on the same morning, one John Brant made a telephone call from the house of Phyllis Rooney, the defendant's wife, in Malden, to the defendant at the Cheek apartment. The defendant asked him to come to the Cheek apartment and he did so. When he arrived the defendant told him "that at some time during the night somebody had stolen four or six hundred dollars out of his pocket while he was sleeping." About 9 — 9:30 A.M. the two went to the McClain apartment, with Brant driving a white Thunderbird automobile which he described as Cheek's car.

At the McClain apartment the defendant accused McClain and Coviello of having taken his money. An argument developed with shouting and screaming, followed by a fist fight and wrestling match between the defendant and McClain. Coviello had a knife which Brant took away from her. At some point the defendant suffered

cuts on an arm and on his back. As Brant and the defendant left the apartment a little before 10 A.M., the defendant said that he would be back and that he would not forget what had happened.

Brant drove the defendant to the Cheek apartment and Brant and Cheek then drove him to a hospital. On the way there the defendant "was yelling and hollering about Ezra [McClain] stabbing him." At the hospital emergency room sixteen sutures were applied to his cuts and he was released. As he was leaving the hospital he told a police officer who was there that "four kids [had] stabbed him in the ball park." This explanation was a "story" which he and Brant had made up on the way to the hospital.

About noon of the same day the defendant had Brant drive him and Cheek to the McClain house. He told Cheek to go up and tell McClain "to forget it, it was all a mistake." She went up to the apartment and had a conversation with Coviello.

Brant and the defendant returned to the Cheek apartment where the defendant made a telephone call. The two then drove to the house of the defendant's brother. The brother shouted from the house: "I found it. It's behind the door." The defendant told Brant to go and get "it." Brant went to the house and returned with a shotgun of .12 or .16 gauge. They then drove to the house of the defendant's wife where the defendant took something from a shelf in the parlor.

Brant and the defendant returned to the Cheek apartment. Cheek told the defendant that even though McClain had just stabbed him, it did not seem to bother him. The defendant started yelling that he would break McClain's head, and swearing and calling McClain names. Brant, Cheek and the defendant then drove to the McClain house, still in Cheek's white Thunderbird. Before arriving there Cheek handed the shotgun to the defendant. The defendant had three shotgun shells in his hand. There were "three clicks of the [gun's] chamber." When the car stopped near the McClain house the defendant told Brant to leave because he did not want to get him involved. Brant left.

About 1 P.M., shortly after the defendant arrived at the McClain house, there was a knock on the door of the McClain apartment, followed by Cheek's statement: "Ezra, let me in. I have something important to tell you." When McClain opened the door a few inches it was pushed open fast. As McClain moved back the defendant stepped into the room holding a gun. He said, "This is for the 50 stitches," and fired two shots. They struck McClain who fell to the floor. The defendant then struck McClain on the head three times with the gun and left the apartment. McClain died very shortly thereafter as a result of a massive hemorrhage resulting from the gunshot wound.

About 1 P.M. of that day, a man who lived on the first floor of the same building heard a loud bang like the slamming of a door and then moments later "there was a lot of noise, people running downstairs." He went to his window and saw a white man and a black girl running down the street to a white car parked at the curb. He described some of the physical characteristics of the man. He had seen the man coming into that building about eight or nine o'clock that morning and he identified that man as the defendant in the court room. The defendant was white. Cheek, also indicted in connection with this crime but not tried with the defendant, was black.

Later that day a State police ballistician found two .12 gauge shotgun shells in the McClain apartment, one live and one discharged. A discharged .12 gauge shotgun shell was found at the McClain apartment on June 8, 1971, and still another one was obtained by the police from the defendant's wife at her home on June 9, 1971. The ballistician examined the three discharged shells and expressed the opinion that all three of them had been fired from the same weapon.

1. *Exculpatory Evidence.* On August 10, 1971, the defendant filed a "Motion to be Furnished with Exculpatory Evidence," which was allowed by the court on October 28, 1971. Neither the motion nor the order of the court is included in the record on appeal nor is there anything in the record to indicate what, if anything, the

Commonwealth produced for the defendant pursuant to the allowance of that motion. After the Commonwealth had rested and before the case was submitted to the jury the defendant filed a motion to dismiss the indictment on the ground that the Commonwealth had failed to disclose to him certain evidence in its possession and favorable to him.

The motion to dismiss describes the allegedly withheld exculpatory evidence only as "statements of . . . [Coviello and Brant] relative to the physical and mental appearance of the defendant, before he was stabbed, after he was stabbed and also immediately . . . [preceding] the alleged shooting of the victim." After a hearing the judge denied the motion without making any findings of fact. The record on appeal is devoid of anything which might enable this court to recognize or identify the Coviello and Brant statements allegedly withheld or the circumstances in which they were made.[1] To the limited extent that the alleged exculpatory evidence is identifiable from the briefs on both sides, we have considered it and we hold that the judge properly denied the motion to dismiss the indictment. This evidence consists of the following:

(a) *Statement of Janet Coviello.* It appears from both briefs that Coviello testified at a "probable-cause" hearing in this case. The record does not give the date of such hearing, but by its very nature it necessarily preceded the return of the indictment on July 9, 1971. Her testimony included a statement that at the time of the shooting or prior thereto the defendant "wasn't in his right mind." It further appears that at that hearing the defendant was represented by counsel, viz., the son and associate of present counsel, that this statement of Coviello was made in answer to a question put to her by the defendant's

---

[1] In the three and one-half pages of the defendant's brief devoted to the argument of this issue there are no references to the pages of the transcript, from which the court may determine the basis for this motion. Such references are expressly required by S. J. C. Rule 1:15 (2), 351 Mass. 739. The appealing party's failure to comply with this rule cannot and does not operate to transfer to the court the burden and responsibility of combing through the 1,655 pages of transcript to try to determine the factual basis for his claim of error; and the fact that under G. L. c. 278, § 33E, we must examine "the whole case for . . . [our] consideration of the law and the evidence," does not relieve the appealing party from the consequences flowing from the failure to comply with the rule.

counsel, that the testimony given at that hearing was recorded stenographically, and that the defendant was furnished with a copy of the transcript of the testimony.

(b) *Statement of John R. Brant.* Brant was a friend of the defendant at the time of this homicide. He had talked to the defendant's counsel about the case since the defendant's arrest, and had visited the defendant once since that time. He was called by the Commonwealth as a witness at the trial of this case on June 28, 1972. He had first talked to the prosecutor on June 24, 1972, and had again talked to the defendant's counsel after that date.

Counsel for the defendant started to cross-examine Brant late on June 28, the first day he appeared as a witness. Brant was neither an unwilling nor an unfriendly witness on cross-examination. He had given pre-trial statements about the case to both the police and to an investigator for the defendant's counsel. In answer to a series of questions about what he had said either to police officers or prosecutors about the defendant's condition immediately after he was stabbed, Brant included many statements which he had not given in his direct examination on the subject. A reading of the cross-examination permits the inference that Brant had promptly reported to counsel for the defendant on everything which had transpired or had been said between him and the police officers or prosecutors, and that counsel was using that information in conducting the cross-examination.

In these circumstances the Commonwealth owed the defendant no duty to inform him about the testimony or statements of either Coviello or Brant. The defendant's reliance on *Brady* v. *Maryland*, 373 U. S. 83 (1963), and *Giles* v. *Maryland*, 386 U. S. 66 (1967), is misplaced. In the *Giles* case Mr. Justice Fortas said in concurring with a plurality opinion: "No respectable interest of the State is served by its concealment of information which is material, generously conceived, to the case, including all possible defenses. This is not to say that convictions ought to be reversed on the ground that information merely repetitious, cumulative, or embellishing of facts otherwise

known to the defense or presented to the court . . . was not disclosed to defense counsel." 386 U. S. 98. The latter statement applies to this case. The defendant was in no way prejudiced by the failure of the Commonwealth to tell him or his counsel what his counsel already knew.

2. *Denial of Request to Muzzle Witness.* On the second day of the trial, the Commonwealth called a police officer as a witness. He testified that he was the first police officer to arrive at the McClain apartment on June 6, 1971, after McClain was shot. He was there for the purpose of protecting the evidence until the police inspector arrived. He stayed about one-half or three-quarters of an hour and then left when the inspector came and took over. He identified four photographs of the premises which were admitted in evidence.

Defence counsel then conducted a cross-examination covering about forty pages of the transcript and lasting to the end of the court day. Most of the examination consisted of asking the witness questions designed to bring out many things which the officer did not know or had not done, none of which had he at any time claimed or professed to know or have done.[2]

As court was closing for the day defence counsel asked that the witness "be instructed not to discuss with anybody this case, because he is still under cross-examination." The request was denied and the defendant excepted. When court resumed the following Monday morning defence counsel asked a number of questions to bring out that over the weekend the witness had talked to the district attorney about a question relating to the case but he did not ask the witness what the conversation was, nor a single question relating to the crime charged against the defendant. He had

[2] The cross-examination brought out the facts that the witness did not know whose blood was shown in the photographs or whether the police had the blood analyzed, or whether there had been a knifing there that morning; that he had not gone to the hospital to see the defendant or investigate his stabbing; that he did not try to talk to the person (McClain) whose body was lying on the floor; that he did not know who rented the apartment; that he had not testified before the grand jury or at the probable cause hearing in this case; that he did not take the photographs; that he did not check for blood spots, bullets or fingerprints and that no one did so while he was there.

obviously concluded his cross-examination on the previous Friday.

The defendant argues, without citing any supporting precedent or authority and admitting that there is no such precedent or authority in this Commonwealth, that the denial of his request "amounted to prejudicial error." The argument is without merit, and in view of the fact that counsel had obviously completed his cross-examination of the witness before making the request it borders on the frivolous.

3. *Alleged Unlawful Search of Automobile.* The Commonwealth sought to introduce in evidence a Massachusetts motor vehicle registration plate issued to the defendant's wife, which the police had taken from the seat of Cheek's white Thunderbird without a search warrant. The defendant claimed the plate had been obtained in an unlawful search of the automobile and moved that it be suppressed. After a voir dire hearing the judge orally denied the motion and admitted the plate in evidence. He filed written findings and rulings on the motion at a later date.

The denial of the defendant's motion was not error. There was sufficient evidence to show that the police were justified in making a warrantless search of and seizure from the Thunderbird, which they found parked and unlocked on a public street. *Chambers* v. *Maroney*, 399 U. S. 42, 48-52 (1970). *Commonwealth* v. *Haefeli*, 361 Mass. 271, 275-283 (1972). *Commonwealth* v. *Rand*, 363 Mass. 554, 560-561 (1973).[3] However, it is unnecessary to consider the issue of the search and seizure further because even if the admission of the registration plate in evidence was error, it was not prejudicial to the defendant. The plate was introduced in evidence on the theory that it tended to connect the defendant with the white Thunderbird belong-

---

[3] The defendant contends that the articles removed from the Thunderbird, the registration plate and a man's T-shirt, were in fact seized after the car had been towed to the police station and not while it was parked on the street. Whether the articles were removed at the spot where the car was found or shortly thereafter at the station makes no difference in terms of the legality of the search and seizure. *Chambers* v. *Maroney, supra*, at 52. See *Cady* v. *Dombrowski*, 413 U. S. 433, 439-448 (1973).

ing to Cheek, and thereby to the murder. In light of the voluminous testimony of eyewitnesses and participants which tended to show that the defendant had been in the Thunderbird several times on the day McClain was killed, the admission of the registration plate had merely a cumulative effect.

4. *Shotgun Shells Obtained from the Defendant's Wife.* The judge admitted in evidence a spent shotgun shell which the police had obtained from the defendant's wife on June 9, 1971, three days after the shooting of McClain. The defendant claimed the wife did not voluntarily and intelligently consent to a search of her house and made an oral motion to suppress the shell. After a voir dire hearing on that issue the judge denied the motion and he later filed written findings and rulings thereon. The denial of this motion was not error.

The judge found in the clearest language possible that Sgt. Willcox went to the house of the defendant's wife, identified himself, and told her he was there "for the purpose of looking for ammunition and possibly the gun involved in the shooting," that she did not have to let him in or to allow the search "in any way, manner or form," that she was "a privileged person in connection with being in this incident, she being the wife" of the defendant, and that if she wanted the police to leave they would do so before actually entering the house. The judge further found that the defendant's wife let the police in the house, that she voluntarily signed a waiver authorizing the search, that two of her friends present signed as witnesses to her signature, and that she then went to a room off the kitchen and brought back some live and spent shotgun shells which she gave to the police.

The judge's findings of fact were supported by the evidence. On the basis of his findings the judge properly concluded that the spent shell was admissible. *Coolidge* v. *New Hampshire*, 403 U. S. 443, 484-490 (1971). *Commonwealth* v. *Martin*, 358 Mass. 282, 285-289 (1970).

The defendant argues before this court that the judge should have found that the defendant's wife did not

voluntarily and intelligently consent to a search and that she could not "comprehend the magnitude of her acts and understand the gravity of the waiver she was signing." That is an argument appropriately addressed to the judge who presided at the voir dire hearing on the motion to suppress, but not to this court. We have too often and too recently stated the law to be that we do not substitute our judgment for that of a hearing judge in such a case to require any further discussion of its application here. *Commonwealth* v. *Frank*, 357 Mass. 250, 253-254 (1970). *Commonwealth* v. *Murphy*, 362 Mass. 542, 548-549 (1972).

5. *Instructions to the Jury*. The judge gave the jury full and complete instructions on the elements of the crimes of murder in the first degree, murder in the second degree, voluntary manslaughter and involuntary manslaughter.[4] Three hours after they retired for deliberation on a verdict, the jury returned to the court room for further instructions on "[w]hat constitutes second-degree murder or manslaughter." The judge repeated the same instructions which he had previously given the jury on these two crimes. The defendant then requested the judge to instruct the jury further "that if they believe that Rooney was knifed, . . . the knifing would amount to a provocation."

The judge properly refused to grant such an instruction. He had twice properly and sufficiently instructed the jury that in order to reduce a homicide from murder to manslaughter the provocation had to be something other than mere words and that it had to be something "that would be likely to produce in an ordinary man such a state of passion, anger, fear, fright or nervous excitement as might lead to an intentional homicide and, moreover, such as did actually produce such a state in the mind of the slayer."[5] *Com-*

---

[4] The defendant saved several exceptions to the instructions given and to the failure to give instructions which he had requested in writing. None of those exceptions is now the basis for any assignment of error, and none related to the instructions on the elements of the four crimes described above.

[5] Portions of both the original and further instruction on voluntary manslaughter are as follows. "Voluntary manslaughter is the intentional and unlawful killing of one human being by another. But the killing is done without malice

*monwealth* v. *Webster*, 5 Cush. 295, 307 (1850). *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931). *Commonwealth* v. *Baker*, 346 Mass. 107, 119 (1963). *Commonwealth* v. *Hartford*, 346 Mass. 482, 490-491 (1963). *Commonwealth* v. *Leate*, 352 Mass. 452, 457-458 (1967). He was not required to give the precise instruction requested by the defendant.

6. *Review under G. L. c. 278, § 33E.* Since this is a "capital case" as defined in G. L. c. 278, § 33E, its entry in this court operates to transfer to us "the whole case for . . . [our] consideration of the law and the evidence." Nothing in our review of the case convinces us that the verdict was against the law or the evidence or that the defendant is entitled to the entry of a verdict of a lesser degree of guilt. There was an abundance of evidence that the defendant, perhaps with the aid of an accomplice, shot and killed McClain in circumstances which support the verdict against him.

A reading of the trial transcript, however, prompts us to make the following observations. The total defence effort at the trial was dedicated to attempts to discredit the Commonwealth witnesses. This is a proper defence function within fair and reasonable limits. While it is difficult to define these limits in the abstract, we believe that they must be defined in each case on the basis of a consideration of the relative rights of the adversary parties and without disregarding the rights of witnesses to fair treatment. Only thus can the judicial process succeed in its important function of bringing forth the facts in order to arrive at a fair and impartial determination of the truth. It will not long succeed if a witness innocent of everything except his

aforethought and it is perpetrated in hot blood or sudden passion or anger or under some great provocation. It must be the result of a provocation that would be likely to produce in an ordinary man such a state of passion, anger, fear, fright or nervous excitement as might lead to an intentional homicide and, moreover, such as did actually produce such a state in the mind of the slayer. Out of tenderness for the frailty of human nature, the law recognizes that under great strain and under great provocation the human mind might be aroused to such an extent by anger or passion and may act with such speed as not to give time for reflection or restraint to the great anger or passion. But not every provocation is of a kind which will reduce the crime to manslaughter. For example, words alone cannot provide a reasonable provocation."

coincidental presence at a time and place where something relative to a crime occurred is to be subjected to a bruising, grueling and abrasive cross-examination in which questions are loaded with unsupported insinuations of improper motives, negligence, incompetence, perjury or, worse, suspicion of guilt of the crime for which the defendant is on trial. The doctor who sutured the defendant's knife wounds at the hospital emergency room was cross-examined as though he were a defendant in a malpractice case. The cross-examination of some of the Commonwealth's witnesses at the trial of this case violated their right to fair and reasonable treatment, and evidenced an unwarranted assumption that only the defendant had rights to be protected. The proper discharge of counsel's duty to his client does not require such an assumption. Equally important, the integrity and continued efficacy of the judicial process cannot permit it. The judge presiding over the trial of a case has the power to keep the examination of witnesses within the limits of common decency and fairness, and he has the duty to exercise that power promptly and firmly when it becomes necessary to do so.

*Judgment affirmed.*