COMMONWEALTH vs. BRUCE W. ANDERSON.

Worcester. November 6, 1990. - December 13, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Capital case.

At a murder trial, the judge adequately instructed the jury on the issue of provocation sufficient to reduce a homicide from murder to manslaughter. [805-808]

At a murder trial the judge's charge could not have misled the jury into disregarding the defendant's theory that he was guilty only of voluntary manslaughter. [808]

On the evidence at a murder trial, the jury were justified in finding the defendant guilty of murder in the first degree based on deliberate premeditation as well as on extreme atrocity or cruelty, and the circumstances presented no occasion for this court, acting under G. L. c. 278, § 33E, to reduce the verdict. [809-810]

INDICTMENT found and returned in the Superior Court Department on November 16, 1983.

After review by this court, 398 Mass. 838 (1986), and Federal habeas corpus proceedings, *Anderson* v. *Butler*, 858 F.2d 16 (1st Cir. 1988), the case was retried before *James P. Donohue*, J.

*Stephen Hrones* for the defendant.

*Claudia R. Sullivan*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court found the defendant, Bruce W. Anderson, guilty of the murder in the first degree of Katherine Anderson, his wife, by reason of deliberate premeditation and extreme atrocity or cruelty. On appeal, the defendant claims error in the judge's instructions to the jury as to: (1) the provocation which will reduce murder to manslaughter; and (2) the need for them to consider of all possible verdicts and to return a verdict of guilty of the high-

est crime proved by the evidence beyond a reasonable doubt. We reject the defendant's claims. We also conclude that there is no reason to exercise our power under G. L. c. 278, § 33E (1988 ed.), to direct the entry of a lesser verdict or to order a new trial.

There was evidence that the defendant had been separated from the victim for a short time and was subject to a restraining order to stay away from her. In the early morning hours of July 27, 1983, the defendant went to the victim's apartment. She refused him entry but he broke in forcibly. The defendant saw a man in the bedroom, and attempted to attack him. After a confrontation, the defendant armed himself with a butcher knife from the kitchen pantry. The man fled and the defendant briefly gave chase. The man last saw the defendant at the entrance of the building waving a knife.

In the meantime, the victim ran upstairs to get away from the defendant, took shelter in another apartment with another couple, and tried to call the police. The defendant then returned, forced his way into the apartment, told the man and woman in the apartment to get out of his way, and stabbed the victim repeatedly. The defendant then left the room, but returned soon after and stabbed the victim several more times. After that, the defendant left and did not return. Later, he surrendered to the police.

There was evidence that the defendant and the victim had argued frequently during their marriage, and that she had urged him to obtain a good job so that he could support her, their young child, and his five-year-old son from a previous relationship who was living with them. There was also evidence that the defendant had become very upset when he caught one of his friends in bed with his first wife, and that the defendant and the victim had agreed not to see anyone else while they were separated.

A psychiatrist testified that the defendant had a narcissistic personality which made him self-centered to the point of being uncaring of others. In the psychiatrist's opinion, the defendant did not suffer from a psychotic disorder. However, the psychiatrist testified that the defendant had acted in an

impulsive way when he killed the victim because he was overwhelmed with rage and anger. As the psychiatrist put it, the defendant was at the time in a "state of loss of temper."

A clinical psychologist agreed that the defendant had a narcissistic personality. He testified that the defendant was anxious about his sexuality and that he was upset by the victim's demands that he find a way to support his family. In the psychologist's opinion, the stimulus to the defendant of seeing the victim with another man (after an incident in which he had found his first wife to be unfaithful) caused the defendant "to become enraged to the point of bizarre and irrational behavior and violence."

1. *Instruction on provocation.* Because the evidence raised an issue of provocation relevant to consideration of voluntary manslaughter, the defendant's counsel requested the judge to instruct the jury as follows:

> "There is a reasonable provocation when something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection, or restraint, and that what happened did produce such a state of mind in the defendant. *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980)."

After instructing the jury clearly and comprehensively on the elements of murder in the first degree (including the issue of mental impairment affecting specific intent), the judge defined voluntary manslaughter and indicated to them that an intentional killing could be found to constitute manslaughter if the defendant had acted under the stress of provocation. The judge addressed provocation in terms of whether an ordinary man in the circumstances would be driven by passion, anger, fear, fright, or stress to commit an intentional homicide.[1]

---

[1]The judge's full charge on provocation reads as follows:

The defendant argues that the judge's instruction, to which he made proper objection at trial, stating that the provocation necessary for mitigation must be such as to cause a reasonable person to kill, misstated the law and prejudiced his defense on a crucial issue. We do not agree.

The language used by the judge was taken from *Commonwealth* v. *Rooney*, 365 Mass. 484, 494-495 (1974), where

"Now what provocation will suffice to reduce an intentional killing to manslaughter? The law does not attempt to define in any narrow way the provocation which may reduce the crime to manslaughter. Reasonable provocation is that kind of provocation that would inflame a reasonable ordinary and law abiding man to the point where he would be capable of killing another person. The rule is that provocation must be such as would be likely to produce in an ordinary man — and here we are referring to an ordinary man not just to a particular defendant — the provocation must be such as would likely produce in an ordinary man such a state of passion, anger, fear, fright or nervous excitement as would eclipse his capacity for reflection or restraint and actually did produce such a state of mind in the defendant.

"In other words, you the jury have to determine two things. Your first inquiry is, would an ordinary man, given all the facts and circumstances of the situation that you have before you — would he be likely to be in such a state of passion, anger, fear, fright or nervous excitement as would lead him to an intentional homicide? An ordinary man is, I suppose, a fictional creature. You ask yourselves how would an ordinary man view the situation in which the defendant found himself at that time — How would an ordinary man react? What would he do? Would the situation be such that he would likely be in such a state of passion, anger, fear, fright or nervous excitement as would eclipse his capacity for reflection and restraint? Secondly, you inquire whether this particular defendant was in that state of mind at the time of the killing, so you note that you have two standards. It's not enough simply that a particular defendant was so nervous or upset that he was, in fact, in the state of fright or nervous excitement. It must also appear that an ordinary man, given the situation with which the defendant was confronted would be in such a state of passion, anger, fear, fright or nervous excitement. Voluntary manslaughter requires that there be a causal connection between the heat of passion and the fatal killing. The act must be the product of the provocation, the result of the state of mind rather than some preexisting, some intention to kill or injure. The killing must follow the provocation before there is reasonable opportunity for the passions to cool. If the passion or other abnormal state of mind ceases to control or if the killing occurs so long after the provocation that in the case of an ordinary person the passion would have ceased to control and the reason would not have resumed control of the mind, then the killing is murder . . . ."

(citing decisions dating back to *Commonwealth* v. *Webster*, 5 Cush. 295 [1850]), the court stated that the trial judge had properly instructed the jury on the provocation necessary to reduce a homicide from murder to manslaughter when the judge advised them that "provocation had to be something other than mere words and that it had to be something 'that would be likely to produce in an ordinary man such a state of passion, anger, fear, fright or nervous excitement as might lead to an intentional homicide and, moreover, such as did actually produce such a state in the mind of the slayer.' " Although this language was not quoted in *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980), the citation in *Walden* to the *Rooney* opinion makes clear that *Rooney* adequately expresses the definition of sufficient provocation. Further, language similar to that used in *Rooney* was used without reproach by the trial judge in *Commonwealth* v. *Weaver*, 395 Mass. 307, 312 (1985). The language in question simply states that if the provocation is not sufficient to cause a reasonable person to kill, then the murder may not be mitigated to manslaughter. While some textwriters may question the appropriateness of the language,[2] it was not error for the judge to have used it as he did in this case. Nor was there error in his choice of the words "would lead" instead of the words "might lead" that were used in the instruction ap-

---

[2]See R. Perkins, Criminal Law 55-56 (2d ed. 1969). W. LaFave & A.W. Scott, Jr., Criminal Law at 573-574 (1972), discuss the subject as follows: "It is sometimes stated that, in order to reduce an intentional killing to voluntary manslaughter, the provocation involved must be such as to cause a reasonable man to kill. Yet the reasonable man, however greatly provoked he may be, does not kill. The law recognizes this fact by holding that the one who thus kills is guilty of the crime of voluntary manslaughter, while, at the same time, the law considers that one who really acts reasonably in killing another (as in proper self-defense) is guilty of no crime. What is really meant by 'reasonable provocation' is provocation which causes a reasonable man to lose his normal self-control; and, although a reasonable man who has thus lost control over himself would not kill, yet his homicidal reaction to the provocation is at least understandable. Therefore, one who reacts to the provocation by killing his provoker should not be guilty of murder. But neither should he be guilty of no crime at all. So his conduct falls into the intermediate category of voluntary manslaughter."

proved in *Rooney*. We conclude that the instructions, considered as a whole, adequately conveyed to the jury the meaning of sufficient provocation.

2. *Instructions on evaluation of alleged offenses*. After the judge had described for the jury the elements of first degree murder, he instructed them as follows:

> "If, after your consideration of all the evidence in this case the Commonwealth has not proven beyond a reasonable doubt the elements necessary to prove the defendant guilty of murder in the first degree, then you must consider whether the Commonwealth has proven murder in the second degree."

Without citation to any authority, the defendant makes a summary argument that this direction was reversible error because the judge should have instructed the jury to consider all possible offenses, particularly manslaughter, before making a decision about murder. Assuming that this contention rises to the level of appellate argument under Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975), it is without merit.

The judge was entitled to inform the jury of its duty to return a verdict of guilty of the highest crime that was proved beyond a reasonable doubt. See, e.g., *Commonwealth* v. *Johnson*, 399 Mass. 14, 16 (1987); *Commonwealth* v. *Dickerson*, 372 Mass. 783, 797 (1977). The disputed portion of the charge was an acceptable articulation of that duty for the jury.[3] Moreover, there was no chance that the jury could have been misled by the charge into disregarding the defendant's theory that he was guilty only of voluntary manslaughter. The judge clearly directed the jury to "consider whether the defendant is guilty of either first degree murder, second

---

[3]Shortly after delivering the portion of the charge in question, the judge restated the point using virtually the same language that appears in the cases. The defendant made no objection. The defendant therefore appears not to contest the general rule requiring the judge to charge the jury to this effect.

degree murder or voluntary manslaughter." The judge also informed the jury that, if the defendant was not found guilty of first or second degree murder, they could find him guilty of voluntary manslaughter, an offense that he comprehensively defined. There was no error.

3. *Review under G. L. c. 278, § 33E.* Emphasizing expert testimony to the effect that he was out of control and acting on impulse when he stabbed his wife, the defendant asks us to exercise our power under G. L. c. 278, § 33E, to reduce the verdict against him from first degree murder to manslaughter. Having carefully reviewed the evidence, we decline to do so.

There was evidence that, although the defendant was enraged when he attacked his wife, he nevertheless acted in a calculating, deliberate, and reflective fashion. For example, when he entered his wife's apartment, the defendant made it impossible for her to summon assistance by ripping the telephone from the wall. After the defendant had chased the other man from his wife's apartment, he had to return and force his way into the neighbors' apartment in order to get to his wife. As he stabbed his wife, the defendant told her "You're gonna fuckin' die, bitch." When an occupant of the apartment in which the stabbing occurred attempted to intercede, the defendant held him at bay (and again confirmed his intentions) by saying, "Get outa my fuckin' way or you'll die too."[4] After stabbing his wife several times, the defendant left the apartment. Rather than leaving at that point, however, the defendant decided to return to stab his wife several more times. The jury reasonably could conclude from this evidence that the stabbing was the product of at least brief reflection. See *Commonwealth* v. *Bousquet*, 407 Mass. 854, 868 (1990); *Commonwealth* v. *Basch*, 386 Mass. 620, 622 (1982), and cases cited.

---

[4]Even one of the defendant's own expert witnesses conceded that this response by the defendant stemmed from a conscious, deliberate effort to prevent others from inhibiting his attack on his wife.

In addition, the defendant stabbed his wife thirteen times, during which she remained fully conscious, telling him that she was dying and apologizing to him. On these facts, the jury were justified in finding that this killing was extremely atrocious or cruel. Compare, e.g., *Commonwealth* v. *Gallagher, ante* 510, 520-521 (1990); *Commonwealth* v. *Bousquet, supra* at 868; *Commonwealth* v. *Carrion,* 407 Mass. 263, 278 (1990). Therefore, we will not disturb the jury's verdict.

*Judgment affirmed.*