COMMONWEALTH *vs.* JUSTIN C. WARD.

Barnstable. September 5, 1997. - December 17, 1997.

Present: WILKINS, C.J., ABRAMS, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Evidence,* Admissions and confessions, Expert opinion. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Waiver. Intoxication. Practice, Criminal,* Reasonable doubt, Instructions to jury, Capital case. *Mental Impairment. Malice. Homicide.*

At the trial of a murder indictment, it was not clear error, in the circumstances, for the judge to find that the defendant's statements to police were voluntarily made, even though, at the time, the defendant was intoxicated [294-295], and ample evidence supported the judge's finding that the defendant had voluntarily, knowingly and intelligently waived his Miranda rights before talking, on two occasions, with police officers [295-296].

The judge's findings and the record of a hearing on a motion to suppress a defendant's statements to police demonstrated that the judge understood and applied the correct standard, viz., beyond a reasonable doubt, in ruling on the voluntariness of the defendant's statements. [296]

At the trial of a murder indictment in which the defendant was convicted of murder in the first degree, the judge erred in refusing to instruct the jury as requested on the relevance of the defendant's mental impairment to the defendant's ability to deliberately premeditate, inasmuch as the defendant had introduced expert testimony on the issue; where the jury had found the elements of second degree murder beyond a reasonable doubt and with proper instructions, this court reduced the conviction to murder in the second degree. [296-298]

This court reviewed the record of a murder trial and found no reason to exercise its powers under G. L. c. 278, § 33E, to order a new trial or reduce the verdict to involuntary manslaughter. [298-300]

INDICTMENT found and returned in the Superior Court Department on May 17, 1994.

A pretrial motion to suppress evidence was heard by *Gerald F. O'Neill, Jr.,* J., and the case was tried before him.

*Carol A. Donovan,* Committee for Public Counsel Services, for the defendant.

*Julia K. Holler,* Assistant District Attorney (*Gary Saladino,* Assistant District Attorney, with her) for the Commonwealth.

FRIED, J. The defendant, Justin C. Ward, was convicted of murder in the first degree and illegal possession of a firearm. He appeals from the murder conviction. Finding error in the judge's jury instruction on deliberate premeditation, we reduce the conviction to murder in the second degree. We decline to grant a new trial or to reduce the verdict to manslaughter under G. L. c. 278, § 33E.

## I

In the early morning of April 1, 1994, the defendant loaded two bullets into a five-chamber handgun and, after spinning the chamber, pointed the gun at his companion and pulled the trigger. The victim, twenty year old Erika Epperson, received a single gunshot wound to the head from which she died several days later.

The defendant and Epperson had lived together for several months in the sublet basement room of a duplex apartment in Hyannis rented by Temple Frazier. Sometime in late February or early March, 1994, the defendant began keeping a skunk in the basement, leading the board of health of Barnstable to issue an eviction notice to Frazier in mid-March. Frazier informed the subtenants living in the duplex to move out by April 1, 1994.

On March 31, 1994, the defendant, the victim, and several acquaintances, including Jason Threokeod, Jill Ladd, and Al L'Heureux, spent the evening at the apartment drinking whiskey and vodka and discussing the eviction. At one point the defendant took a gun out of his pocket and showed it to L'Heureux. Shortly after midnight, as the group drove Threokeod home, the defendant began to play "Russian roulette" with the gun. He first pointed the gun at his own head and pulled the trigger. He then asked permission to point the gun at Threokeod, who acquiesced, and the defendant again pulled the trigger.

The group dropped the defendant off at a convenience store, and he then went to visit Michelle Marcotte at approximately 1 A.M. He arrived carrying a bottle of vodka and the gun, which he unloaded and gave to Marcotte. There was some evidence that while at Marcotte's residence the defendant loaded the gun, spun the chamber, and wanted to play Russian roulette again.

At approximately 3:30 A.M., Marcotte took the defendant to the hospital to receive a rabies vaccine, which he needed

because his skunk had bitten him. The hospital nurse noted that the defendant smelled of alcohol, but that he did not lean against the counter and was able to sit without falling. The nurse could understand him when he spoke, and he responded appropriately to questions. The defendant left before receiving the vaccination, and he and Marcotte went home independently.

Sometime after 4 A.M. the defendant awakened his neighbor, Michael Rogers, who lived in the other side of the duplex. The defendant had blood on his shirt and face. He told Rogers that the victim had been shot and that he needed to use the telephone to call for help. The defendant dialed 911 and requested medical assistance. He then begged Rogers to help him save the victim, and told Rogers that the defendant and the victim had been playing a game, she had been shot, and he could not find the gun. The defendant left Rogers's apartment shortly thereafter and the police arrived.

The police found the victim lying face down in the basement apartment. She had sustained a gun shot wound to her left temple. On examining the victim, the police saw the gun lying nearby. It was a .32 caliber revolver. It required a continuous "heavy pull" on the trigger to fire; it did not have a hair trigger, and it could not be precocked. The police inspected the gun and found that it contained one live round seated in the next firing position but no spent shell, suggesting that the gun had been emptied before the police arrived. Two spent .32 caliber shell casings were found in the apartment. Forensic evidence indicated that the gun was at least two to three feet away from the victim when it was fired, ruling out a self-inflicted wound.

The defendant was taken into protective custody and transported to the police station. At approximately 5 A.M. the defendant was booked by Officer John Sweeney, who advised the defendant of his Miranda rights. After stating each of the Miranda warnings, Officer Sweeney paused and asked the defendant whether he understood. The defendant stated that he did, and at one point said, "Yeah, cool. Like TV." The defendant stood on his own and was able to answer questions coherently.

The defendant submitted to a breath analysis, which showed a blood alcohol content of .39. This is several times the legal limit for the operation of a motor vehicle. The defendant was then seated in a holding room. While there he initiated a conversation with Officer Mark Palmer, who was present to supervise the defendant. Palmer reminded the defendant of his

Miranda rights, and the defendant said, "I don't care. I'll tell you anything you want to know." The defendant told Palmer that on arriving home in the early hours of April 1, 1994, the defendant had loaded the gun with one bullet, spun the barrel, and pointed the gun at his own head. The defendant said that he pulled the trigger, the gun clicked, and he then placed the gun on a table. The defendant then told Palmer that the victim picked up the gun and, pointing it at her own head, pulled the trigger, shooting herself. When Palmer asked whether the defendant had held the gun to the victim's head, the defendant denied that he had.

At approximately 2 P.M. on the next day, the defendant was interviewed by Detective John Murphy. Murphy had known the defendant for several years. Murphy repeated the Miranda warnings, and the defendant stated that he understood his rights. The defendant then said that he remembered loading two bullets into the gun, and he repeated the story that he had told Palmer previously. When Murphy asked the defendant whether he, rather than the victim, had held the gun, the defendant stated that it was "possible." When pressed on this issue, the defendant indicated that he no longer wanted to talk with the detective and the interview stopped.

At trial, evidence was presented that the defendant was a heavy drinker and had consumed up to one-half a gallon of alcohol a day for many months prior to April 1, 1994. The Commonwealth's expert, Nancy Burns, testified that a tolerant alcoholic who daily ingests large quantities of alcohol will often manifest few cognitive impairments from drinking, even with a blood alcohol content of .39. The evidence also showed that the defendant had a familiarity with guns and had pointed guns at various acquaintances on several occasions in the months prior to April 1, 1994. In addition, the defendant's landlord testified that the defendant was extremely possessive about the victim. The Commonwealth introduced evidence that the defendant marked what he considered his "territory" with a graffiti tag consisting of the word "NO." On the night of the killing this graffiti was found on the walls of the defendant's basement room and on the abdomen of the victim. The defendant's expert, Dr. Marc Whaley, testified that such graffiti could be used to suggest ownership. These graffiti were not on the walls earlier on the night of March 31, 1994, when the defendant's friend L'Heureux was at the apartment. Dr. Whaley also testified that

the defendant displayed a history of attention deficit disorder with hyperactivity which could affect his ability to weigh the pros and cons of carrying out intended actions and impair his abstract reasoning.

## II

## A

The defendant first seeks a new trial on the ground that the Superior Court judge erred by refusing to suppress the defendant's April 1, 1994, statements to the police. We accept the judge's findings of fact absent clear error and give substantial deference to his ultimate conclusions. *Commonwealth* v. *Fernette*, 398 Mass. 658, 662-663 (1986). We make an independent determination about the correctness of the judge's application of constitutional principles to the facts. See *Brewer* v. *Williams*, 430 U.S. 387, 403 (1977); *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996).

The defendant first claims that his extreme intoxication precluded the Commonwealth from proving beyond a reasonable doubt that his statements to the police were voluntarily made as the product of a "rational intellect" and a "free will." See *Commonwealth* v. *Edwards*, 420 Mass. 666, 673 (1995); *Commonwealth* v. *Tavares*, 385 Mass. 140, 145, cert. denied, 457 U.S. 1137 (1982). There is no question that the defendant was intoxicated. He had been drinking for several hours, he smelled of alcohol, and a breath analysis revealed a blood alcohol content of .39. Evidence of intoxication alone, however, does not compel a finding that statements were involuntary. *Commonwealth* v. *Mello*, 420 Mass. 375, 385 (1995).[1] The defendant was a tolerant alcoholic who was often intoxicated but nevertheless able to make apparently rational decisions. Just prior to the shooting on April 1, 1994, the defendant interacted with a hospital nurse in a rational fashion and did not appear incapacitated. Immediately after the shooting he sought help from his neighbor Rogers in a lucid and coherent manner. The police officers who booked and detained the defendant testified that, although the defendant was intoxicated, they could readily

---

[1]Although the defendant argues that his extreme intoxication was compounded by stress and anxiety about the harm he had just caused, there was no evidence that this stress precluded the defendant's ability to make voluntary statements.

understand and converse with him. At the police station the defendant behaved calmly and seemed aware of his circumstances. Moreover, Detective Murphy, who had had numerous prior conversations with the defendant both when the defendant was intoxicated and when he was sober, testified that, when he spoke with the defendant on the afternoon of April 1, the defendant was lucid and able to respond intelligently. It was not clear error for the judge to find that the defendant's statements were voluntarily made.

Second, the defendant argues that the Commonwealth did not prove beyond a reasonable doubt that he voluntarily waived his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). The Commonwealth bears this burden. *Commonwealth* v. *Edwards*, *supra* at 669. A Miranda waiver must be voluntary, knowing, and intelligent. *Id.* at 670. And, as with voluntariness generally, intoxication bears heavily on the validity of a Miranda waiver, although it is insufficient alone to require a finding of involuntariness. *Commonwealth* v. *Shipps*, 399 Mass. 820, 826 (1987).

In determining whether a Miranda waiver was voluntary, knowing, and intelligent, a judge must examine the totality of the circumstances. See *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1046 (1983), quoting *Edwards* v. *Arizona*, 451 U.S. 477, 486 n.9 (1981). There was ample evidence that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights. The defendant appeared lucid, coherent, and able to understand his circumstances and surroundings. Officer Sweeney properly stated the Miranda rights when the defendant was booked at the police station, and sought to make sure that the defendant affirmed his understanding after each warning. The defendant demonstrated understanding of the Miranda warnings by saying, "I understand" and, "Yeah cool, like on TV." The defendant then initiated a conversation with Officer Palmer in the holding room. When Palmer reminded the defendant of his Miranda rights, the defendant stated that he understood those rights and said, "I don't care. I'll tell you anything you want to know." The defendant showed that he understood that he could refuse to converse with the police by resisting discussion with Palmer about the identity of the gun's owner. Similarly, in his later interview with Detective Murphy, after again receiving and acknowledging understanding of the Miranda warnings, the defendant again demonstrated his comprehension by eventually

ending the conversation when pressed about the possibility that the defendant, and not the victim, pulled the gun's trigger. The judge did not err in finding that the Commonwealth proved beyond a reasonable doubt that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights.

Third, the defendant claims that, although the judge stated clearly that he found the defendant's statements and waiver to be voluntarily given, the judge's denial of the motion to suppress was improper because the judge did not state that he found voluntariness "beyond a reasonable doubt." The defendant suggests that the judge may have incorrectly applied the lower Federal standard and found voluntariness only by a preponderance of the evidence.

When a judge denies a motion to suppress statements made to the police, the judge's conclusion of voluntariness must appear with "unmistakable clarity" on the record. See *Commonwealth* v. *Mello, supra* at 383; *Commonwealth* v. *Fernette, supra* at 663; *Commonwealth* v. *Tavares, supra* at 152. We have previously held, however, that, although we encourage judges to use the words "beyond a reasonable doubt" in their findings, it is not error not to do so. See *Commonwealth* v. *Mello, supra* at 382-383; *Commonwealth* v. *Brown,* 392 Mass. 632, 637 (1984). It is the conclusion itself based on adequate findings of fact, not the standard used to reach that conclusion, that must be unmistakably clear.

During argument on the motion to suppress, the judge was reminded repeatedly by counsel of the reasonable doubt standard. Moreover, in his findings the judge articulated that the Commonwealth bears a "heavy burden" in showing that a defendant's statements are voluntary. This is sufficient to show that the judge understood and applied the correct standard in this instance.[2]

## B

The defendant next argues that the jury charge contained two related errors. First, the defendant correctly claims that because

---

[2]Because defense counsel used the defendant's statements in making his case, the issue of voluntariness was never submitted to the jury and thus the judge never instructed the jury regarding the appropriate standard of proof. Cf. *Commonwealth* v. *Mello,* 420 Mass. 375, 382 (1995) (taking such jury instruction as evidence that judge applied correct standard in hearing on motion to suppress evidence).

his expert witness, Dr. Marc Whaley, testified that the defendant's capacity to "weigh the pros and cons of carrying out his intended actions" was significantly impaired and that the defendant suffered "some impairment" of his ability to form specific intent, the judge should have included a requested jury instruction on the relevance of the defendant's mental impairment to his ability to engage in deliberate premeditation.[3] The judge's omission violated the well-settled principle that a jury should consider expert testimony tending to show that a defendant's mental condition impaired his ability to engage in deliberate premeditation. See *Commonwealth* v. *Dunton*, 397 Mass. 101, 102, 104 n.3 (1986); *Commonwealth* v. *Prendergast*, 385 Mass. 625, 634 (1982); *Commonwealth* v. *Gould*, 380 Mass. 672, 683 (1980) ("[i]f expert testimony . . . is elicited" going to the ability to evaluate the pros and cons of effectuating the desire to kill, "then the judge should instruct the jury that the defendant's mental illness may be considered on the issue of deliberate premeditation"). For this reason the verdict of guilty of murder in the first degree cannot stand.

Second, the defendant claims that we must order a new trial because an error in the judge's third prong malice instruction infected *any* finding of murder, first or second degree. In his initial instruction on malice, the judge properly told the jury that they could consider both intoxication and mental impairment in determining whether the defendant was capable of forming the specific intent required for the first two prongs of malice.[4] At the defendant's urging, the judge then extended his *Gould* instruction to third prong malice because Dr. Whaley had testified that the defendant suffered from "substantial impairment" of his ability to appreciate the facts and circumstances

[3]Defense counsel requested that the jury be instructed to consider "any long standing mental illnesses or mental conditions," in addition to the effects of alcohol, in determining whether the defendant was capable of deliberate premeditation. Although the judge issued the instruction on voluntary intoxication, he failed to include a charge on mental impairment despite the defendant's repeated objections.

[4]The Commonwealth argues that the mental impairment instruction regarding the specific intent required for first and second prong malice somehow corrects the judge's omission regarding premeditation. Where the court determines that a *Gould* instruction is warranted on the specific intent elements of malice, it should also give such an instruction regarding premeditation. While deliberate premeditation necessarily implies the formation of intention for purposes of malice, the reverse is not so since deliberate premeditation is a more stringent requirement than intention alone.

that could lead to death or serious injury to others. See Commonwealth v. Sama, 411 Mass. 293, 298-299 (1991). In a later response to the jury's questions regarding the definition of deliberate premeditation and malice, the judge omitted reference to mental impairment from his third prong malice instruction.

The defendant's reliance on this omission in the third prong malice reinstruction is misplaced. There was no obligation to repeat the intoxication instruction.[5] See Commonwealth v. Johnson, 425 Mass. 609, 613 n.5 (1997) ("[t]he judge was not required to reinstruct on intoxication when he responded to the jury's request during deliberations for reinstruction on malice aforethought"); Commonwealth v. Barros, 425 Mass. 572, 577 (1997) ("[t]he judge was not required to repeat [the intoxication] instruction in response to the jury's request for a further instruction regarding the elements of malice"). The jury found the elements of murder in the second degree beyond a reasonable doubt and under proper instruction. Because of the error in the instruction on deliberate premeditation, and because the Commonwealth indicated at oral argument that it would not wish to retry the defendant on the charge of murder in the first degree, we reduce the conviction to murder in the second degree.

III

We have reviewed the record as a whole and have found no further reason to exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict to involuntary manslaughter.[6] There is no miscarriage of justice in convicting the defendant of murder in the second degree, nor is a verdict of involuntary manslaughter more consonant with justice. See Commonwealth v. Coyne, 420 Mass. 33, 36 (1995).

The defendant cites various cases in which gun play has led

[5]The cases the defendant cites to support his argument that this omission was error are inapposite. Each involves a constitutionally infirm jury instruction shifting the burden of proof, which requires a more explicit correcting instruction than required in other contexts. See Francis v. Franklin, 471 U.S. 307, 322 (1985); Commonwealth v. Repoza, 400 Mass. 516, 519-520, cert. denied, 484 U.S. 935 (1987).

[6]The defendant argues that there was insufficient evidence for a conviction of deliberately premeditated murder, and that the judge therefore erred in denying his motion for a required finding of not guilty on that charge. Given that we reduce the conviction to murder in the second degree, we do not reach this issue.

to a conviction of involuntary manslaughter. This is not a case in which the defendant did not know that the gun contained live bullets or pulled the trigger accidentally. See *Commonwealth* v. *Wallace*, 346 Mass. 9, 13 (1963); *Commonwealth* v. *Bouvier*, 316 Mass. 489, 494-495 (1944); *Commonwealth* v. *Depradine*, 42 Mass. App. Ct. 401 (1997); *Commonwealth* v. *Griffin*, 8 Mass. App. Ct. 276, 279 (1979). The defendant purposefully loaded ammunition into a weapon, aimed the weapon at the victim, and intentionally pulled the trigger. In Russian roulette, "the outcome is a certainty if the chamber under the hammer happens to be the one containing the bullet." *Commonwealth* v. *Atencio*, 345 Mass. 627, 631 (1963).

The jury in this case were instructed and charged on involuntary manslaughter. The jury could have convicted the defendant of that lesser crime, but they did not. We do not sit as a second jury. See *Commonwealth* v. *Coyne*, *supra* at 35; *Commonwealth* v. *Luce*, 399 Mass. 479, 485 (1987). The jury heard testimony that the defendant and the victim faced impending eviction, that they had had a disagreement on the night of March 31, 1994, and that the defendant was extremely possessive of the victim and seemed upset about temporarily separating from her. Moreover, the jury could correctly have found malice from the defendant's actions alone.[7]

No mitigating factor suggests a different conclusion. The victim died in one of a series of encounters in which the defendant chose to gamble with the life of another. Neither the defendant's mental impairment nor the involvement of alcohol compels a different conclusion. See *Commonwealth* v. *Costa*, 414 Mass. 618, 630 (1993); *Commonwealth* v. *Lake*, 410 Mass. 47, 51 (1991).

The case is remanded to the Superior Court where the verdict

---

[7]Our decision is consonant with decisions by courts in other States. See, e.g., *State* v. *Mackey*, 687 So. 2d 465, 469-470 (La. App. 1996) (finding specific intent to kill or inflict great bodily harm where defendant loaded one bullet into a gun, pointed the gun at his own head, pulled the trigger to no effect, then pointed the gun at the victim, and pulled the trigger once, discharging the gun); *People* v. *Haack*, 396 Mich. 367 (1976) (holding that intent to kill may be inferred where the defendant loaded four bullets into a gun, positioned the chamber so that there was no bullet under or immediately to the left of the hammer, and fired the gun at victim under misconception that chamber rotated clockwise rather than counterclockwise); *Commonwealth* v. *Ashburn*, 459 Pa. 625 (1975) (finding malice and affirming conviction of second degree murder where defendant loaded one bullet into a pistol, spun the chamber, pointed the gun at an acquaintance, and pulled the trigger twice).

and sentence are to be vacated; a verdict of guilty of murder in the second degree is to be entered and sentence imposed thereon.

*So ordered.*