## COMMONWEALTH *vs.* JUAN TORRES.

Hampden. April 5, 2002. - August 8, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Homicide. Assault with Intent to Rape. Burglary. Armed Assault with Intent to Murder. Assault and Battery by Means of a Dangerous Weapon. Practice, Criminal,* Capital case, Argument by prosecutor, Instructions to jury, Jury and jurors, New trial. *Evidence,* Criminal records. *Jury and Jurors.*

The judge at a criminal trial did not err in admitting in evidence the defendant's prior criminal record, where the defendant's counsel had "opened the door" to this information, and where the judge instructed the jury in the strongest possible terms immediately following the introduction of the prior convictions evidence that they were not to infer from it that the defendant was guilty of the crimes being tried. [463-464]

At the trial of an indictment charging murder in the first degree on a theory of extreme atrocity or cruelty, the prosecutor's reference to the jury's having the "conscience of the community" was not improper, because where a charge of murder in the first degree is based on a theory of extreme atrocity or cruelty, the jurors serve as the conscience of the community in determining whether the killing merited that description [464-465]; however, other remarks made by the prosecutor were improper, but the error did not prejudice the defendant [465-466].

At a criminal trial, the judge did not err in instructing the jury on the effect of voluntary drug use on a claim of lack of criminal responsibility, in that there was some evidence to suggest that the defendant knew or should have known that his alcohol and drug use would cause him to lose awareness that his violent and sexual fantasies were only fantasies; however, although the judge should have instructed the jury that their determination of what the defendant should have known was a subjective question that took into account the possibility that the defendant's mental condition might have interfered with his ability to understand what a normal person in the same situation would have reasonably understood, the error created no substantial likelihood of a miscarriage of justice, as the evidence of the defendant's sanity was overwhelming. [466-468]

A criminal defendant who sought a new trial because a juror had not disclosed, at the time of the defendant's trial, the fact that she was then on a probationary continuation without a finding for a drug offense did not carry his burden of showing that the judge who denied the motion for a new trial had committed an abuse of discretion or had committed clear error. [468-469]

INDICTMENTS found and returned in the Superior Court Department on March 28, 1996.

The cases were tried before *Daniel A. Ford,* J., and a motion for a new trial, filed October 11, 2000, was heard by him.

*David Duncan* for the defendant.

*Jane Davidson Montori,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. On trial for murder in the first degree, assault with intent to rape, armed burglary, armed assault with intent to murder, and assault and battery by means of a dangerous weapon, the defendant, Juan Torres, also known as "Johnny," asserted that he was not guilty by reason of insanity. The jury rejected this contention and found him guilty of all charges.[1] The defendant appeals, claiming error in (1) the admission in evidence of his prior record; (2) the prosecutor's closing argument; (3) the jury instruction on voluntary drug use; and (4) the denial of his motion for a new trial, which was based on a seated juror's undisclosed continuance without a finding in a drug case. The defendant also requests that we order a new trial or direct the entry of a lesser degree of guilt on the murder conviction under the authority of G. L. c. 278, § 33E. We affirm the convictions and the denial of the defendant's motion for a new trial, and decline to exercise our extraordinary power under G. L. c. 278, § 33E.

1. *Facts.* We recite the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in connection with the issues raised. See *Commonwealth* v. *Adams,* 434 Mass. 805, 807 (2001). Theresa Visneau and Patricia Henry were sisters who lived together in Springfield. The defendant was Henry's daughter's boy friend. Henry had lived with the defendant and her daughter for a couple of years prior to making her home with Visneau. The defendant had spent holidays at the sisters' home before, and had good relationships with them both.

On March 16, 1996, the defendant and his brother rented a U-Haul truck and moved a bureau and a desk to the sisters' home for them. They left between 6:30 and 7 P.M. to the sisters' hugs, kisses, and thanks. Just before 1 A.M. on March 17, the

---

[1]The defendant was found guilty of murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder, with armed robbery as the underlying felony.

defendant returned, parking the U-Haul truck a few houses away. He crawled in through a front porch window and attacked Visneau. She struggled free of his grasp and screamed. Henry came into the room and said, "Johnny, what are you doing?" While the defendant's attention was distracted, Visneau ran to the telephone and dialed 911. The defendant grabbed her away from the telephone and stabbed her in the neck while she pleaded with him. He pushed her to the floor, and Henry set upon him. He threw her to the floor on top of her sister, then picked her up and took her into the bedroom. Henry cried out, "Daddy, please help me,"[2] and "Johnny, don't do this to me."

The police arrived and Visneau opened the door, screaming, "He's raping my sister." The police found Henry in her bedroom, unclothed and bloody. A knife was lodged in her neck, and she died from multiple stab wounds. Death occurred within minutes.

The defendant had heard the police arrive and, in his haste to leave, had left his coat on the bed in Henry's room. In it were his wallet and keys to the U-Haul. The police followed a trail of blood through the house and out a living room window. They used the coat to set a tracking dog on the defendant's scent. The dog led the officers to the defendant, who was hiding underneath a nearby car.

After waiving his Miranda rights, the defendant told police[3] that he had drunk "a few beers," "sniffed a little cocaine," and watched a televised boxing match and bits of "adult movies" before breaking into the sisters' house to steal money he believed they kept under a mattress. He said that he knew he would have to kill the sisters because they could identify him.

Dr. David Gansler, a neuropsychologist who evaluated the defendant, testified that he suffered from a dysfunction in the frontal portion of the left hemisphere of his brain. The defendant's language abilities were at the mental retardation level, but were offset by strengths in "paying attention" and visual perception. His "full scale" I.Q. was eighty-three. Because of his lack of language skills, the defendant was at a

---

[2]The sisters' father had died eight years earlier.

[3]The defendant does not contest the voluntariness of his statement.

"serious disadvantage" in social functioning, emotional functioning, self-restraint, and self-awareness. Dr. Gansler testified that individuals who lack language skills solve problems "physically, and aggressively."

Dr. Jacob Holzer, a psychiatrist, testified that the defendant suffered from obsessive-compulsive disorder, and that when he ingested drugs and alcohol, these substances combined with his disorder, causing him to have obsessive, recurrent fantasies about sex and violence. According to Dr. Holzer, on the night in question, these thoughts became so vivid that the defendant lost the understanding that they were fantasies and entered a psychotic state. Dr. Holzer testified that the defendant was substantially unable to conform his behavior to the requirements of law (and therefore was not criminally responsible, see *Commonwealth* v. *McLaughlin*, 431 Mass. 506, 507-508 [2000]), because of the combination of obsessive-compulsive disorder and intoxication, which triggered a psychotic state at the time of the incident.

*2. The defendant's criminal history.* On cross-examination, the prosecutor elicited from Dr. Gansler a description of antisocial personality disorder.[4] On redirect, the following exchange took place between defense counsel and Dr. Gansler:

*Q.*: "[Y]ou didn't make a diagnosis of antisocial personality disorder, did you?"[5]

*A.*: "I noted antisocial tendencies. Yes, I did."

*Q.*: "You don't know whether any of those [indications of

---

[4]Antisocial personality disorder is characterized primarily by a pattern of disregard for, and violation of, the rights of others, as indicated by repeatedly engaging in criminal acts, lying, aggressive behavior, and lack of remorse. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 649-650 (4th ed. 1994) (unchanged in 4th ed. rev. 2000). Antisocial personality disorder generally does not constitute a mental disease or defect that could negate criminal responsibility. See, e.g., *Commonwealth* v. *Stockwell*, 426 Mass. 17, 21 (1997); *Commonwealth* v. *Sheriff*, 425 Mass. 186, 188 (1997). See also J.R. Nolan & L.J. Sartorio, Criminal Law § 674, at 673 & n.11 (3d ed. 2001), quoting Model Penal Code § 4.01 (Official Draft 1962) ("the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct").

[5]Of course, leading questions generally should not be used in direct (or redirect) examination, although the trial judge retains wide discretion to allow them. See P.J. Liacos, Massachusetts Evidence § 3.5, at 59-61 (7th ed. 1999).

antisocial personality disorder] are in fact things [the defendant] did on other occasions?"

*A.:* "Not all of them, no."

*Q.:* "But some because of this case, right?"

*A.:* "I did ask, I did get his criminal history, yes. I did know of something."

On recross-examination, the prosecutor said, "Tell us what you learned about his criminal history." Over the defendant's objection, the judge permitted Dr. Gansler to confirm that the defendant had acknowledged "a long history of trouble with the law" and a five-year sentence for armed robbery.

The Commonwealth asserts that the defendant "opened the door" to this information by asking whether Dr. Gansler's notation of the defendant's antisocial tendencies was based on the defendant's actions in this case. We agree. Once trial counsel had "opened up" the subject, the prosecutor was entitled to explore it in more detail. *Commonwealth* v. *Key,* 381 Mass. 19, 28-29 (1980). See *Commonwealth* v. *Gordon,* 407 Mass. 340, 352 (1990); *Commonwealth* v. *Wilson,* 52 Mass. App. Ct. 411, 418 (2001). The judge instructed the jurors "in the strongest possible terms" immediately following the introduction of the prior convictions evidence that they were not to infer from it that the defendant was guilty of these crimes, and we presume that jurors follow the judge's instructions. See *Commonwealth* v. *Sullivan,* 435 Mass. 722, 732 (2002). There was no error.

3. *Closing argument.* The defendant next claims that the prosecutor's closing argument contained improper appeals to emotion and a statement of the prosecutor's personal opinion of the defendant's guilt. The relevant portions consist of the following:

"They had a right to sleep in their bed without this man coming in there. . . .

"You have the conscience of the community. She had rights, she had the right to go to bed at night. She had the right to live. He took those rights. She called out, 'Daddy help me.' But her father was dead.

"You could answer the call for justice and hold [the

defendant] accountable for what he did. He's guilty as charged."

As to the reference to the "conscience of the community," there was no impropriety. Where a charge of murder in the first degree is based on the theory of extreme atrocity or cruelty, as it was in this case, the jurors serve as the conscience of the community in determining whether the killing merits that description. See *Commonwealth* v. *Raymond*, 424 Mass. 382, 391 (1997); *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 547 (1993). Contrast *Commonwealth* v. *Mathews*, 31 Mass. App. Ct. 564, 573 (1991) (jurors, in rape case, "bear no such burden; their role in a trial is limited to finding the facts on the basis of the evidence, dispassionately and impartially").

The remainder of the statements at issue, however, were improper. The remarks concerning the victims' rights were improper appeals to sympathy. See *Commonwealth* v. *Lodge*, 431 Mass. 461, 470-471 (2000), and cases cited. The next few sentences ("She called out, 'Daddy help me.' But her father was dead. You could answer the call for justice and hold [the defendant] accountable for what he did") managed to combine an improper exhortation that the jurors vindicate the victim with an improper appeal to sympathy through the suggestion that, although the victim's father could not help her, the jurors could. See *Commonwealth* v. *Walker*, 421 Mass. 90, 103 (1995), and cases cited. Finally, the statement, "He's guilty as charged," was an improper statement of personal belief. See, e.g., *Commonwealth* v. *Coleman*, 366 Mass. 705, 713-714 (1975). The Commonwealth's concessions that the remarks regarding the victims' rights were improper and that the comment regarding the call for justice "would have been better left unsaid," understate the violation.

Improper statements by the prosecutor are reviewed for prejudicial error. In determining prejudice, we consider (1) whether the defendant seasonably objected; (2) the judge's instructions; (3) the centrality of the error; (4) the jury's ability to recognize hyperbole; and (5) the strength of the Commonwealth's case. See, e.g., *Commonwealth* v. *Rosario*, 430 Mass. 505, 515 (1999), quoting *Commonwealth* v. *Wilson*, 427

Mass. 336, 351 (1998). "The cumulative effect of all the errors in the context of the entire arguments and the case as a whole is considered in making this determination." *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998).

Of these errors, only the references to the victims' rights were objected to at trial. The judge provided no curative instructions in particular, but forcefully instructed the jurors both that "[e]motion or sympathy for one side or the other have no place in these deliberations," and that they were the sole judges of the facts and should disregard any personal opinions expressed by counsel in closing argument. The central issue at trial was the defendant's sanity, and the errors in closing did not bear on that point. To a certain degree, jurors are expected to "discount hyperbole and other improper statements," *id.* at 495, and the Commonwealth had a strong case for the defendant's appreciation of the wrongfulness of his actions and his ability to conform his behavior to the requirements of law, see *Commonwealth* v. *McLaughlin*, 431 Mass. 506, 508 (2000): the defendant crawled in through a window in the middle of the night, grabbed the telephone away from Visneau when she dialed 911, and left Henry when he heard the police arrive, escaping through another window and hiding under a car to evade detection. He told police that he had hoped to steal money, and realized that he would have to kill the sisters because they could identify him. The defendant's own expert agreed that an attempt to prevent Visneau from dialing 911 would demonstrate both an appreciation for the wrongfulness of his actions and an ability to conform his conduct at that moment.

On balance, we conclude that the prosecutor's improper closing did not prejudice the defendant. "[W]e are not to be taken as condoning the prosecutor's statement," *Commonwealth* v. *Coleman*, 366 Mass. 705, 714 (1975), "[b]ut even grossly improper statements by a prosecutor will not require a new trial when the evidence of guilt is overwhelming," *Commonwealth* v. *McCravy*, 430 Mass. 758, 765 (2000), citing *Darden* v. *Wainwright*, 477 U.S. 168, 182 (1986).

4. *Jury instruction on voluntary drug use.* The defendant next complains that the judge erred in instructing the jury on the ef-

fect of voluntary drug use on a claim of lack of criminal responsibility, with what is commonly referred to as a *Herd* instruction. See *Commonwealth* v. *Herd*, 413 Mass. 834, 839-840 (1992). The defendant did not object at trial (in fact, he requested that a *Herd* instruction be given[6]), so we review the claim for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

The judge instructed the jury as follows:

"[I]ntoxication with either alcohol or drugs or both or drug addiction resulting from the voluntary consumption of alcohol or drugs or both is not by itself a mental disease or defect that would support a verdict of not guilty by reason of insanity. . . . However, you may consider whether or not the defendant had a mental disease or defect separate and distinct from his drug or alcohol consumption and whether such mental disease or defect existed at the time of the crimes independent of any temporary intoxication or high that the drugs or alcohol may have caused. In addition you may consider whether the defendant's voluntary consumption of drugs or alcohol or both activated a mental disease or defect apart from any addiction. If as a result of the activation of that mental disease or defect the defendant lost the substantial capacity to understand the wrongfulness of his conduct or to conform his conduct to the requirements of law, then he would lack criminal responsibility. However, if the Commonwealth proves beyond a reasonable doubt that the defendant either knew or had reason to know that consumption of alcohol or drugs would activate a mental disease or defect, then the Commonwealth has met its burden of proving the defendant criminally responsible. It is not necessary that the Commonwealth prove that the defendant knew or had reason to know that he had a mental disease or defect as such so long as the Commonwealth

---

[6]The defendant requested the following: "Intoxication with alcohol and/or drugs is not by itself a 'mental disease or defect' that will support a finding of insanity. However, under some circumstances a person's consumption of alcohol and/or drugs may activate a latent mental disease or defect, apart from the intoxication itself. Such a latent mental disease or defect, once activated, may be the basis for a finding of insanity, unless the Defendant knew or had reason to know that the alcohol and/or drugs would activate that illness."

> proves beyond a reasonable doubt that the defendant knew
> or had reason to know that his intoxication from consump-
> tion of drugs and/or alcohol would trigger inappropriate
> conduct by him."

The defendant argues that this instruction caused a substantial likelihood of a miscarriage of justice because there was no evidence to suggest that the defendant knew or should have known that his alcohol and drug use would cause him to lose awareness that his violent and sexual fantasies were only fantasies. This is incorrect. Dr. Holzer, on direct examination, stated that the defendant had reported that, "unlike most other occasions" of his drug and alcohol use, on the night of the killing, he lost the realization that his obsessions were fantasies, and the boundary between fantasy and reality broke down for him. The jury properly could have inferred from the doctor's use of the word "most" that this transformation had happened before, and that therefore the defendant either knew or should have known of that possibility.

The defendant next claims error in the judge's failure to instruct the jury that their determination of what the defendant "should have known" is a subjective question that takes into account the possibility that the defendant's mental condition "might have interfered with his ability to understand what a normal person in the same situation would have reasonably understood." *Commonwealth* v. *Ruddock*, 428 Mass. 288, 291 (1998). The defendant correctly claims that the judge should have made the subjective nature of the inquiry clear, see *id.*, but there is no substantial likelihood of a miscarriage of justice as a result of the oversight. As we explained in part 3, *supra*, the Commonwealth's evidence of the defendant's sanity was overwhelming. We are substantially confident that the jury's verdicts would have been the same had this error not occurred. See *Commonwealth* v. *Ruddock*, *supra* at 291 n.2.[7]

5. *Motion for a new trial.* The defendant moved for a new trial when he discovered that a juror who had checked "none" in response to the question on her juror questionnaire asking

---

[7]For this reason, we need not address the defendant's further claim that the judge erred in instructing that the defendant was guilty if he knew or should have known that the drugs or alcohol would trigger "inappropriate conduct."

about any involvement as a party in a criminal case had been on a probationary continuance without a finding for a drug offense at the time of the defendant's trial.

After an evidentiary hearing at which counsel had the opportunity to present questions to the juror through the judge, the judge determined that the juror did not intentionally lie on the form but simply made a mistake, and also determined that she was credible when she testified that the matter never even occurred to her during the course of the trial. He found that if she had been asked about the matter before trial, she would have truthfully responded that it would not affect her ability to be a fair and impartial juror, and pointed out that if anything, her status as a criminal defendant in a drug case would have concerned the Commonwealth more than the defendant.

In denying the defendant's motion for a new trial, the judge concluded, "I am confident, based upon my interview with [the juror], that she took her duties seriously and gave the defendant a fair trial." This determination is a question of fact that rests with the trial judge. See *Commonwealth* v. *Duran*, 435 Mass. 97, 108 (2001). "In the absence of clear abuse of discretion or a showing that the judge's findings were clearly erroneous, the judge's ruling will not be disturbed on appeal." *Commonwealth* v. *Amirault*, 399 Mass. 617, 626 (1987). Our review of the hearing reveals that the judge conducted a meaningful inquiry, and that he reasonably could have found the juror credible. The defendant has not carried his burden of showing an abuse of discretion or clear error here, and we will not set aside the judge's decision. See *id.* at 626-627.

6. *G. L. c. 278, § 33E.* After reviewing the record in its entirety, we find that the verdict of murder in the first degree was supported by the evidence, and conclude there has been no miscarriage of justice. Therefore, we decline to grant relief under G. L. c. 278, § 33E.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*