# COMMONWEALTH VS. JUAN RUIZ.

Suffolk. October 7, 2004. - November 19, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & SOSMAN, JJ.

*Homicide. Evidence,* Spontaneous utterance, Opinion, Absence of witness.
*Practice, Criminal,* Capital case, Argument by prosecutor, Instructions to
jury, Assistance of counsel, Defendant pro se. *Constitutional Law,* As-
sistance of counsel, Right of defendant in criminal case to act pro se.

At the trial of indictments charging the defendant with murder in the first
degree, the judge did not err in admitting in evidence as spontaneous utter-
ances statements made by the victim's daughter to a police officer, where the
daughter was visibly shaking and upset when she made the statements and
spoke shortly after having witnessed the defendant (her father) stab her
mother, and where the lapse of ten minutes between the daughter's first
spontaneous utterance and a later, more detailed statement did not disqualify
the statements as spontaneous utterances [832-833]; further, the judge did
not err in admitting testimony from an emergency medical technician
concerning his opinion regarding the reasons for the victim's difficulty in
breathing, where the judge had an adequate basis for implicitly qualifying
the witness as an expert, given his training and certification [833-834];
finally, no error arose from the admission of testimony of a police officer
concerning his efforts to find a certain individual [834-835].

At the trial of indictments charging the defendant with murder in the first
degree on a theory of extreme atrocity or cruelty, the prosecutor did not err
in arguing during his closing that the defendant spread out his blows on
the victim and that he did so to cause and increase her pain, as the argu-
ment was presented by way of reasonable inferences that could be drawn
from the evidence [835-836]; likewise, the prosecutor's argument that the
victim chose to "meet her fate" and died trying to protect her young
children [836] and his remarks concerning the victim's prolonged suffering
after the defendant had left the scene [836-837] were not improper appeals
for sympathy, and while certain remarks may have been questionable
exhortation, they could not have caused a substantial likelihood of a miscar-
riage of justice [837]; in addition, there was no merit to the defendant's
contention that the prosecutor improperly indicated a belief in the
defendant's guilt [837-838], and the prosecutor's remarks that the defendant
[838] and another witness [838] had lied were proper.

At the trial of indictments charging the defendant with murder in the first
degree on a theory of extreme atrocity or cruelty, the judge correctly
charged the jury on first prong malice [838], and did not err in not charg-
ing the jury on sudden combat [838-839]; moreover, while the judge erred
in his manslaughter instruction on heat of passion on reasonable provoca-

tion by using the word "may" rather than "must," the error did not create a substantial likelihood of a miscarriage of justice, where the jury were repeatedly instructed on the correct standards and could not have misunderstood the law [839]; finally, the judge did not err when instructing the jury whether words may constitute reasonable provocation [839-840].

The judge at a criminal trial did not abuse his discretion in denying the defendant's motion to discharge his counsel two weeks prior to trial, where the defendant's first attorney had been permitted to withdraw on the day the trial had first been scheduled to occur seven months earlier; where the defendant's trial counsel, while joining in the defendant's motion, stated that he could and would represent the defendant's desired strategy; where trial counsel was very experienced in trying murder cases; and where the defendant failed to make the required showing of good cause [840-841]; moreover, the judge did not violate the defendant's constitutional right of self-representation when the judge did not permit him to proceed pro se during the course of the trial, where the defendant never made an unequivocal, knowing, and voluntary election to proceed pro se [841].

The counsel for the defendant at a criminal trial was not ineffective in failing to obtain telephone and pager records; in his handling of certain witnesses; in failing to obtain and use the criminal records of two witnesses; in causing, through his alleged shortcomings, the grand jury to be "deprived" of an exculpatory portion of the defendant's statement to police at his booking; in failing to object to various parts of the prosecutor's closing arguments and the judge's instructions to the jury; or in failing to challenge the integrity of certain evidence and the delay in producing other evidence. [841-842]

INDICTMENTS found and returned in the Superior Court Department on October 1, 1998.

The cases were tried before *Joseph A. Grasso, Jr.*, J., and a motion for a new trial, filed on January 2, 2003, was heard by *Peter M. Lauriat*, J.

*Susan J. Baronoff* for the defendant.

*Joshua I. Wall*, Assistant District Attorney (*Amanda Lovell*, Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. A jury convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty,[1] and of assault with intent to kill. A judge who was not the trial judge denied the defendant's motion for a new trial. Represented by new counsel on appeal, the defendant argues error in (1) the admission of certain trial testimony; (2) the prosecutor's closing

---

[1]The Commonwealth had proceeded on theories of deliberate premeditation and extreme atrocity or cruelty.

argument; and (3) the judge's instructions to the jury. He also argues that he was deprived of his constitutional rights of self-representation and the effective assistance of trial counsel. Finally, the defendant seeks relief pursuant to G. L. c. 278, § 33E. We affirm the order denying the motion for a new trial and the judgments of conviction, and we decline to exercise our authority under G. L. c. 278, § 33E, to grant the defendant relief.

Based on the Commonwealth's evidence, the jury could have found as follows. Prior to her death, Carmen Ruiz (Carmen)[2] and the defendant had been married for fourteen years, and lived with their four children in Revere. The defendant worked to support the family, and Carmen worked also, at a Rent-A-Center. During the summer of 1998, Carmen had an affair with a coworker, Angel Negron. Negron and his friend and coworker, Anthony Matos, would go to the Ruiz house on their days off and would sometimes socialize and drink with the defendant.

After a Fourth of July party, the defendant angrily told Carmen that he did not want Negron and Matos at his home. Later, sometime in the middle of August, the defendant moved out of the house. One Thursday in late August, the defendant told Carmen's sister, Angelica Diaz, that he was coming back on "social Friday"[3] to "get the guys from Rent-A-Center," and that he did not want those men in his home. He also told Diaz that he had instructed his friend, Hector Polanco, who lived in the basement of the Ruiz home, to page him whenever Negron and Matos came to the house.

Within days of the incident, Polanco overheard the defendant and Carmen arguing. Carmen wanted to end their marriage. The defendant said he was devoted to his children and asked why Carmen paid so much attention to Negron and Matos and why the men were at the house so often.

At work on September 1, 1998, Carmen told Negron that she had told the defendant about their relationship. Several hours after work that day, Matos drove Negron to the Ruiz house.

---

[2]Because some of the witnesses share the same last name, where appropriate, we use the first name of the witness.

[3]Angelica Diaz testified that in her country, "social Friday" marked "when the weekend starts" and was a time to socialize, drink, and have parties.

They arrived around midnight. They talked and joked in the living room with Carmen. The telephone rang. Carmen answered and spoke with the defendant. After a short conversation, Carmen handed the telephone to Negron. The defendant told Negron that he was on his way over and that they had to talk, and Negron agreed. Approximately ten minutes later, Negron went to the bathroom. Polanco had come upstairs, answered the door, and let the defendant into the house.

The defendant and Carmen went into the kitchen and started arguing. Eventually, a physical struggle ensued. The defendant went to the bathroom, pounded on the door, and yelled at Negron to come out so they could talk. Matos got up and headed over to the defendant and Carmen, who were in the hallway near the bathroom. Polanco came back up the stairs to see what was going on, and the defendant told him not to move. Matos approached the defendant, asked him what was going on, and told him that he (Matos) and Negron had not come to the house to cause trouble. Matos looked over toward Carmen and the defendant stabbed Matos six times.[4] Matos's wounds were in his abdomen and chest.

On observing Matos with blood on his stomach, Polanco ran out of the house and contacted a friend to pick him up. Matos also left the house and crossed the street seeking help.

The defendant's twelve year old daughter, Angie, woke up needing to use the bathroom. When she opened the bedroom door, she saw the defendant stabbing Carmen, her mother, with a black-handled knife with an eight to ten inch blade. Angie pulled on her father's shirt to try to stop him from stabbing her mother. The defendant turned and looked at Angie, but continued stabbing Carmen. Angie went back to her room and picked up the telephone to call the police. The defendant looked at Angie and saw her with the telephone, then ran out with the knife. The defendant got into his vehicle and drove away.

A neighbor was awakened by banging on his front door. He went to the front of his house and saw Carmen in front of her house. He went to her, grabbed the telephone that she was hold-

---

[4]Polanco's testimony differed from Matos's testimony. Polanco testified that Matos grabbed the defendant from behind and, when Matos turned around, Polanco saw blood on Matos's stomach.

ing, and said, "Get an ambulance here right away." He asked Carmen who had done this, and she replied, "My husband." Carmen then told the neighbor to take care of Matos, who was at the neighbor's front door.

Negron came out of the bathroom and saw Carmen "drop" right outside the front door of the house. Angie checked on her siblings, and then found her mother lying on the porch in the front of the house with a telephone in her hand. Negron ran to Carmen and found her covered with blood, gasping for air, and moaning.

At approximately 2:20 A.M., emergency medical technicians (EMTs) received a call directing them to the Ruiz home. They arrived minutes later. One of the EMTs treated Carmen at the front of the house and on route to the hospital. During that time, which was approximately thirty-five to forty minutes, Carmen was conscious for about thirty minutes and struggled to breathe. Her shirt was saturated with blood, and she was bleeding profusely from the abdomen. Fat and tissue protruded from one wound to her abdomen. On arrival at a hospital, this EMT had to initiate cardiopulmonary resuscitation (CPR). After CPR was performed, Carmen "moaned briefly."

Carmen died at approximately 5:30 A.M. She had multiple stab wounds to her chest and abdomen, and some to her upper thighs (a total of ten stab wounds). Each of the two wounds to her abdomen was a mortal wound. Carmen also had several defensive wounds to her right hand.

During his booking, the defendant showed a State trooper a bruise on his right elbow and said that he got it when he fell backward when two men came at him and he "grabbed the knife." The trooper saw no other injuries to the defendant.

The defendant testified as the sole witness for the defense. His testimony was as follows. He discussed his relationship with Negron and Matos, the difficulties he was having in his marriage with Carmen, and the understanding that Negron and Matos were not to be allowed in the house. The defendant also testified that in July, 1998, he learned from a third party about Carmen's relationship with Negron.

According to the defendant, at about 2 A.M. on September 2, Carmen paged him and entered a code that he understood to

mean he should telephone her at home. When he did call, Carmen answered and said Negron was there. Negron got on the line and said he had to talk with the defendant. The defendant agreed. However, the defendant stayed at the home of Julissa Ruiz, a cousin, until he got another message on his pager directing him to come home.

The defendant drove home and let himself in. He greeted Matos, and headed to the kitchen where he heard Carmen talking with a male. Then Negron came at the defendant quickly, saying, "You're a mother fucker," and that the defendant wanted to take his woman, his "bitch." The defendant walked backward and said, "No, you wanted to speak with me."

Negron pushed the defendant, who fell to the floor. While falling, the defendant's arm hit "the sectional," scratching his elbow and leaving a bruise. As the defendant got up, he saw Negron draw a knife from his front pocket. When Negron opened the knife and tried to attack him, the defendant grabbed his hands. As Negron pushed him, the defendant backed up to the front door, which was closed. While the defendant was trying to push Negron into the closet and escape, Matos hit him on the head and grabbed and pulled him from behind. The defendant pulled Negron down with him. The defendant fell on top of Matos, and Negron fell on top of the defendant. Negron's "hands got loose." The defendant saw the knife on the floor and grabbed it.

Negron ran to the bathroom and shut the door. Pushing Carmen aside, the defendant ran to the door, kicked it, and said, "If you're a man, come out," and asked, "Were you only a man because you had a knife?" The defendant wanted Negron out of the house. Then someone hit the defendant hard on the head two or more times. The defendant felt dizzy and thought these people wanted to kill him.

Then, the defendant recalled, "Something in me came out that I had never seen in my life that I didn't know." Frightened, confused, and trying to defend his life, the defendant started thrusting the knife in every direction. He must have stabbed Matos, who was swinging at him, and must have stabbed Carmen because she was "getting on" the defendant and "trying to

hit" him. The defendant "couldn't say" whether Carmen actually hit him.

The defendant explained that the stabbings were not intentional or premeditated; it happened very fast. The defendant did not see Angie, his daughter. Eventually, he found himself alone in the house. As he left the house, he saw that Carmen was outside with a telephone in her hand. Carmen was giving out the house's address and screamed, "Juan, no, Juan, no," when she saw the defendant. The defendant knocked the telephone out of Carmen's hand, and said to her, "You wanted to kill me."

The defendant got into his car and drove off. He discarded the knife in a park, but did not recall where. He also threw away his clothes. Soon thereafter, the defendant went to New York City. The next day, after learning Carmen was dead, the defendant returned to Boston and turned himself in.

1. *Admission of testimony.* a. We reject the defendant's argument that the judge improperly admitted Angie's statements to Officer Maria Lavita as spontaneous utterances. A judge has broad discretion in determining whether a statement qualifies as a spontaneous utterance, and that determination will only be disturbed on such an abuse of discretion. See *Commonwealth* v. *King*, 436 Mass. 252, 255 (2002), and cases cited.

The judge's ruling had adequate support. Officer Lavita arrived at the home while Carmen was lying on the porch, "bleeding profusely," but conscious. Officer Lavita observed that Angie was "visibly shaking" and "upset," and that her eyes were "very wide." The officer led Angie away from her mother and asked her what happened. Angie said, "My father did this to my mother." About ten minutes later, while still in the same condition, Angie described the stabbing in more detail. That Angie's statements to Officer Lavita were made in response to questioning did not render them inadmissible. See *Commonwealth* v. *Fuller*, 399 Mass. 678, 682-683 & n.8 (1987). The officer's testimony that Angie was "visibly shaking" and "upset" during the relevant time, and that she spoke shortly after having witnessed her father stab her mother, was sufficient to satisfy that aspect of the exception calling for a display of adequate excitement. See *Commonwealth* v. *Santiago*, 437 Mass.

620, 624-625 (2002). There is no requirement that a declarant demonstrate a "highly agitated" demeanor.

The testimony that only ten minutes had passed between the time Officer Lavita took Angie away from her mother and the time Angie made her second, more detailed statement, did not disqualify the statements as spontaneous utterances. See *Commonwealth* v. *DiMonte*, 427 Mass. 233, 239 (1998), quoting *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 223 (1973) ("[T]here can be no definite and fixed limit of time. Each case must depend upon its own circumstances"). There is no requirement that the statements be made contemporaneously with the exciting cause. See *Commonwealth* v. *Crawford*, 417 Mass. 358, 362 (1994), *S.C.*, 430 Mass. 683 (2000). The time frame involved here, ten minutes, does not even border on what we have described as an "outer limit." See *Commonwealth* v. *Di-Monte, supra* at 239-240, and cases cited. Angie's statements satisfied the requirements of the exception and were properly admitted.[5]

b. The defendant alleges error in the admission of testimony from Charles McDevitt, an EMT who treated Carmen, concerning "what was happening" to Carmen, namely that Carmen was suffocating and her lung may have been collapsing. The defendant objected to the testimony on the basis that McDevitt's expertise would not permit him to render an expert medical opinion regarding the reasons for Carmen's difficulty in breathing. The defendant's claim is reviewed to determine whether there was error and, if so, whether the error was prejudicial. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998).

"[T]he question of an expert's qualifications is for the trial judge, and his determination will be reversed only on an abuse of discretion or error as matter of law." *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 (1975), and cases cited. "The criterion of the judge is whether the witness possesses sufficient skill,

---

[5]The defendant does not argue that admission of Angie's spontaneous utterances constituted a violation of the principles stated in *Crawford* v. *Washington*, 541 U.S. 36 (2004). Here, Angie testified at trial and was subjected to cross-examination. We, therefore, do not need to address what impact the *Crawford* case might have on the admission of spontaneous utterances made by persons who do not testify.

knowledge or experience in the field of his testimony that the jury may receive appreciable assistance from it." *Id.* The judge had an adequate basis for implicitly qualifying McDevitt as an expert. See *id.* at 183.

McDevitt testified about his training as an EMT, and he explained the requirement of State certification that he had received after passing a State examination. He also testified that he had worked in the field as an EMT for six years. Further, McDevitt indicated that in both his training to be an EMT and his training to be a paramedic (which he subsequently became), he was trained concerning the reasons why someone with a chest injury may experience difficulty in breathing, namely, that the person's lung may be collapsing or that the air may "just keep being forced to one side." McDevitt then explained the treatment for such a condition — placing clear plastic wrap over the chest wounds — which he performed on Carmen, and which operated to stop "more air from going in" as she breathed. It was not necessary for the judge expressly to qualify McDevitt as an expert. See *Commonwealth* v. *Richardson*, 423 Mass. 180, 184 (1996); *Commonwealth* v. *Boyd*, *supra* at 183.

c. The defendant alleges error in the admission of testimony from Trooper Stephen Walsh concerning his efforts, after interviewing Matos, to find a man named Ismael, who lived with Julissa Ruiz, the defendant's cousin, in Winthrop. Trooper Walsh testified that he had learned that Ismael and Julissa had moved, and that he could not locate them. The defendant objected on hearsay grounds. The defendant argues that this testimony, in effect, suggested that Ismael had accompanied him on the evening of the stabbing, and that Ismael had fled out of consciousness of guilt, thereby portraying the defendant "as guilty by association."

There was no error in admitting Trooper Walsh's testimony that he could not locate the couple. Matos had testified that another man (whom he knew was not Polanco) had accompanied the defendant into the house. In addition, there was testimony that the defendant was friendly with Ismael and that the defendant was at Ismael's home for a few hours before he returned home and committed the stabbings. With this evidence in mind, the judge permissibly allowed the prosecutor to inquire

as he did of Trooper Walsh. Questions of relevancy are matters within the trial judge's discretion. *Commonwealth* v. *Wilson,* 427 Mass. 336, 349 (1998). Admission of the remaining challenged testimony did not prejudice the defendant in view of the fact that Angie witnessed the defendant's stabbing of Carmen. See *id.* at 348-349.

2. *Prosecutor's closing argument.* The defendant argues that the prosecutor engaged in improper closing argument. The defendant did not object to any of the alleged errors. Consequently, if we find errors, we examine them to determine whether they created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Rice,* 441 Mass. 291, 299 (2004). We consider the challenged remarks in the context of the entire argument, the judge's instructions to the jury, and the evidence at trial. See *Commonwealth* v. *Obershaw,* 435 Mass. 794, 806 (2002). "A prosecutor is entitled to argue forcefully for the defendant's conviction." *Commonwealth* v. *Wilson, supra* at 350. Excusable hyperbole is not a ground for reversal, and the jury "are presumed to have a certain measure of sophistication in sorting out excessive claims on both sides." *Id.* The relevant factors in measuring the cumulative effect of all the alleged errors are (1) whether the defendant seasonably objected; (2) the judge's instructions to the jury; (3) the centrality of the error; (4) the jury's ability to sort out excessive claims by the Commonwealth; and (5) the strength of the Commonwealth's case. *Commonwealth* v. *Torres,* 437 Mass. 460, 465 (2002).

a. The defendant maintains that the evidence did not support the prosecutor's argument that the defendant spread out his blows on Carmen, and that he did so to cause and increase her pain. The argument was appropriate, as it was presented by way of reasonable inferences that could be drawn from the evidence. See *Commonwealth* v. *Murchison,* 418 Mass. 58, 60 (1994).

From the first 911 telephone call made by Carmen, the jury could reasonably infer that Carmen had been stabbed before she placed the call, as she stated in the recording, "I'm bleeding." The jury also could have inferred that the defendant stabbed her just after the call ended, as Carmen was heard on the recording crying, "Juan, no, por favor," and "Juan, not me," followed by her screaming and the sound of what the jury could have reason-

ably inferred was the telephone being knocked out of her hand. The jury could have inferred further that what Angie witnessed followed these events, as she did not testify concerning her mother's making a telephone call or having a telephone in hand before she saw her father stabbing her mother. At the very least, from Angie's testimony the jury could have found that the defendant stopped stabbing Carmen to look at Angie, and after looking at her, continued. From the fact that there were ten stab wounds alone, the jury could find that all ten wounds were not instantly inflicted. The number of stab wounds and the existence of defensive wounds supports an inference that the defendant intended to increase Carmen's pain, as does the content of Carmen's first 911 call together with the defendant's own testimony that he knocked the telephone out of Carmen's hand when he found her relaying her address.

b. The defendant asserts that the prosecutor's remarks that Carmen chose to "meet her fate" and died trying to protect her young children, knowing that her oldest daughter had witnessed the stabbing, were unsupported by evidence and constituted an improper appeal for sympathy. The argument was proper.

There was evidence that the children were home and in rooms just outside the area where the conflict started. It was reasonable to infer that their mother did not want to expose them to any danger or harm by attempting to retreat into one of those rooms with the knife-wielding defendant on her heels. See *Commonwealth* v. *Raymond*, 424 Mass. 382, 389-390 (1997). It was also reasonable to infer that Carmen saw Angie, as Angie testified that she saw her mother and had actually tried to stop her father from stabbing her mother by pulling on the defendant's shirt. These were not improper appeals for sympathy, but rather material factors to consider in evaluating whether the defendant acted with extreme atrocity or cruelty. See *Commonwealth* v. *Murphy*, 426 Mass. 395, 402 (1998); *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983).

c. We reject the defendant's argument that the prosecutor's remarks concerning Carmen's prolonged suffering after the defendant left the scene were improper appeals for sympathy. The consciousness and degree of suffering of the victim is one of the *Cunneen* factors that may be considered in determining

whether the defendant acted with extreme atrocity or cruelty. See *Commonwealth* v. *Cunneen, supra.* See also *Commonwealth* v. *Kent K.*, 427 Mass. 754, 760 (1998). There is no requirement that the defendant actually observe the suffering he caused.

d. In his last remarks to the jury, the prosecutor stated:

> "On September 2, 1998, [the defendant] was in control. He had the knife. And, when he was in control, it was time for killing and it was time for cruelty. But, here in this court room, the laws of this Commonwealth are in control. The killing is over. The cruelty is over.

> "Under the laws of this Commonwealth, it is the truth and the justice that flows from that truth that controls. In this court room, right here and now, it is time for justice. Let him have it."

The defendant argues that these remarks were an improper appeal for sympathy. Such comments have been characterized as "questionable exhortation" by the Appeals Court. *Commonwealth* v. *Cruz*, 53 Mass. App. Ct. 393, 405 n.14 (2001). See *Commonwealth* v. *Torres, supra* at 465-466 (prosecutor's statement in closing argument that, "You could answer the call for justice and hold [the defendant] accountable for what he did," was improper, but did not require new trial). But the prosecutor did not have the benefit of the *Cruz* decision when he tried the case in 1999. We conclude that the remarks could not have caused a substantial likelihood of a miscarriage of justice. The Commonwealth's case was strong. The judge repeatedly instructed the jury that the arguments of counsel are not evidence and may not serve as the basis for their verdict. He also instructed them that they were to determine the facts solely from the evidence, and must be fair and impartial and decide the facts without prejudice, fear, bias, or sympathy.

e. There is no merit to the defendant's contention that the prosecutor improperly indicated a personal belief in the defendant's guilt by stating the defendant "is a first degree murderer." The defendant focuses on a portion of the prosecutor's statement instead of the entire statement, which clearly indicated that he was arguing what conclusion the jury should draw from the evidence. See *Commonwealth* v. *Obershaw*, 435

Mass. 794, 806 (2002). See also *Commonwealth* v. *Wilson*, 427 Mass. 336, 351 (1998).

f. The prosecutor's remarks that the defendant had lied about where he was (outside the house versus inside the kitchen) when he knocked the telephone out of Carmen's hand, was proper. The remarks were based on reasonable inferences from the evidence, namely, the contents of what had been recorded on the two 911 calls from the Ruiz home, the fact that Carmen was heard on both calls, and the neighbor's testimony that he took a telephone from Carmen when she was outside the house. See *Commonwealth* v. *Murchison*, 418 Mass. 58, 60 (1994).

g. On this record, the prosecutor could permissibly argue that Polanco had lied because the argument was presented "as a reasonable inference that the jury should draw from such evidence." *Id.* at 62. Particularly, the prosecutor's remarks were based on Polanco's inconsistent statements as established through his grand jury testimony. See *id.* at 60-61.

3. *Jury instructions.* The defendant argues several errors in the judge's instructions to the jury.

a. When charging the jury about first prong malice (applicable to murder in the first degree on a theory of deliberate premeditation), the judge used the instruction on the use of a dangerous weapon from the Model Jury Instructions on Homicide 61 (1999). The defendant argues that the charge was "skimpy" and "did not sufficiently alert the jury that, while [they] could infer malice from the use of a dangerous weapon, [they were] not required to do so." The defendant objected below. The instruction was correct and accurate. *Commonwealth* v. *Obershaw*, *supra* at 809.

b. The defendant asserts that it was error for the judge not to charge on sudden combat. He claims that the instruction was warranted based on (1) his testimony that Negron suddenly attacked him with a knife, followed by Matos's hitting him repeatedly and hard on the head and Carmen's "join[ing] in the fray," and (2) Polanco's testimony that he saw the defendant and Carmen struggling and slapping each other and Carmen jumping on the defendant before he pushed her to the floor, and that he saw Matos grab the defendant from behind.

The defendant overlooks the basic fact that the provocation

must come from the victim. See *Commonwealth* v. *Gruning*, 46 Mass. App. Ct. 842, 849 (1999), and cases cited. In addition, "physical contact between a defendant and a victim is not always sufficient to warrant a manslaughter instruction, even when the victim initiated the contact." *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980), and cases cited. Focusing on these principles, the motion judge correctly concluded that "the evidence taken in the light most favorable to [the defendant] shows that, at most, Carmen slapped and jumped on [him], possibly at the same time Matos hit him. Carmen's slaps and physical contact would not alone warrant a sudden combat instruction." See *Commonwealth* v. *Curtis*, 417 Mass. 619, 629 (1994). See also *Commonwealth* v. *Anderson*, 408 Mass. 803, 807 (1990). Because Carmen's conduct presented no threat of serious harm to him, the defendant was not entitled to the instruction and there was no error. See *Commonwealth* v. *Walden*, *supra* at 728.

c. The defendant claims error in the judge's manslaughter instruction on heat of passion on reasonable provocation and the excessive use of force in self-defense because the judge used the word "may," rather than the word "must," as required by the Model Jury Instructions on Homicide 27 (1999). While the judge's slip of the tongue was erroneous, the error, in view of the charge as a whole, did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Grant*, 418 Mass. 76, 85 (1994). The jury were repeatedly instructed on the correct standards, including in response to a question asked by them. They could not have misunderstood the law.

d. The defendant claims that when the judge instructed the jury whether words may constitute reasonable provocation, a substantial likelihood of a miscarriage of justice occurred from the judge's failure to instruct, on his own initiative, that "the existence of sufficient provocation is not foreclosed because a defendant learns of a fact from a statement rather than from personal observation. If the information conveyed is of the nature to cause a reasonable person to lose his self-control and did actually cause the defendant to do so, then a statement is sufficient." The defendant claims that Negron's statement to him that Carmen was his "bitch" confirmed Carmen's past

infidelity and "confronted [the defendant] with the prospect of Carmen's continued infidelity, instead of promised reconciliation." The words used by Negron were mere insults, insufficient to provide a reasonable provocation, see *Commonwealth* v. *Bermudez*, 370 Mass. 438, 440 (1976), and had not relayed any new information to the defendant because, by his own testimony, he had learned of Carmen's relationship with Negron a couple of months earlier, see *Commonwealth* v. *Rodriguez*, 431 Mass. 804, 812 (2000).

4. *Right of self-representation and ineffective assistance of trial counsel.* The defendant alleges errors by the judge as to his request to represent himself and by his trial counsel which he claims deprived him of effective assistance of trial counsel. We review the claims under G. L. c. 278, § 33E. See *Commonwealth* v. *Frank*, 433 Mass. 185, 187 (2001); *Commonwealth* v. *Parker*, 420 Mass. 242, 246 (1995).

a. The judge did not abuse his discretion in denying the defendant's motion to discharge his counsel, which the defendant filed only two weeks prior to trial.[6] See *Commonwealth* v. *Britto*, 433 Mass. 596, 600 (2001). "When the defendant seeks a continuance to substitute counsel at or near the time of trial, the judge must balance the defendant's right to choose his counsel with the interests of the court, the public, the victim, and the witnesses." *Commonwealth* v. *Dunne*, 394 Mass. 10, 14 (1985). Before ruling on the motion, the judge held a hearing at which he heard from both the defendant and his trial counsel. The judge took note of the fact that the defendant's first attorney had been permitted to withdraw on the day the trial had first been scheduled to occur seven months earlier. Although the defendant's trial counsel joined in the defendant's motion, his trial counsel stated that he could and would represent the defendant's desired strategy, and trial counsel was very experienced in trying murder cases. Finally, as brought out by the judge, the defendant failed to make the required showing of good cause. *Commonwealth* v. *Britto, supra.* The evidence the defendant wanted his trial counsel to obtain and introduce

[6]The defendant argues that the improper denial of the motion deprived him of his constitutional right to effective assistance of counsel during trial.

bore only on the theory of deliberate premeditation, a theory the jury rejected.

b. We reject the defendant's contention that his constitutional right of self-representation was violated when the judge did not permit him to proceed pro se during the course of the trial. When the defendant's trial counsel informed the judge out of the hearing of the jury that the defendant wished to represent himself, the judge, after removing the jury, conducted a colloquy with the defendant in which he inquired of the defendant's concerns and informed him of the consequences of such an invocation. The record demonstrates that the defendant never made an unequivocal, knowing, and voluntary election to proceed pro se. See *Commonwealth* v. *Scott*, 360 Mass. 695, 699 (1971). Rather, the defendant indicated that he desired his trial counsel to continue with his questioning.

c. We reject the defendant's claim that his trial counsel was ineffective in failing to obtain telephone and pager records to corroborate the defendant's testimony that Carmen summoned him home. Such evidence could arguably serve to undercut the prosecutor's theory that the stabbing was deliberately premeditated (a theory the jury rejected even without this evidence). What records exist were provided by the prosecutor to defense counsel following trial. The defendant has not established that the records would have even been available to his trial counsel, or that they would have recorded the "code" allegedly entered by Carmen. See *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). The record before us suggests that the defendant learned that he could gain nothing from the records.

d. We agree with the judge who denied the defendant's motion for a new trial that trial counsel's handling of certain witnesses does not support a claim of ineffective assistance of trial counsel.

e. The defendant maintains that his trial counsel was ineffective in failing to obtain and use, for impeachment purposes, the records of criminal convictions of Matos and Negron. The facts that the witnesses had prior convictions were introduced in the form of stipulations, and the judge instructed the jury, at each respective time, they were required to "accept . . . that as proven and true" (and as bearing only on that witness's

credibility). In his final instructions to the jury, the judge instructed again that "stipulations are matters you are not free to disbelieve." Absent evidence to the contrary, the jury are presumed to follow the judge's instructions. See *Commonwealth* v. *Lynch*, 439 Mass. 532, 544 (2003). There was no error. See *Commonwealth* v. *Martinez*, 437 Mass. 84, 93 (2002).

f. The defendant argues that due to his trial counsel's shortcomings, the grand jury and the jury were "deprived" of "an exculpatory portion of [the defendant's] statement" to police at his booking that he had been "attacked." Both the grand jury and the jury were informed by Trooper Baldwin Leon that the defendant had told him during his booking that "two guys came at me." During his cross-examination at trial, Trooper Walsh stated that he understood Trooper Leon's discussion with the defendant, as interpreted by Trooper Leon, to have indicated that the defendant stated that he had been "attacked." Thus, the jury heard everything the defendant claims they should have. As for the grand jury, the defendant fails to demonstrate how evidence that two men "came at" him, as opposed to his being "attacked" by two men, caused any harm.

g. The defendant argues alleged errors of his trial counsel based on counsel's failures to object to various parts of the prosecutor's closing argument and the judge's instructions to the jury, matters that we have already decided and need not discuss further.

h. The defendant's remaining ineffective assistance of trial counsel claims, including the claims that his trial counsel should have challenged the integrity of photographs of the crime scene and failed to challenge the Commonwealth's delay in producing autopsy photographs and an alleged statement by Angelica Diaz, are without merit. The defendant has not shown that "better work [by trial counsel] might have accomplished something material for the defense." *Commonwealth* v. *Satterfield, supra* at 115. There was no substantial likelihood of a miscarriage of justice.

5. *Review pursuant to G. L. c. 278, § 33E.* The defendant argues that the court should order a new trial or reduce the verdict to manslaughter because there was no evidence that, prior to the stabbing, he had been violent to Carmen or to Ne-

gron and Matos; he was a hard worker with no criminal record; he was confronted with "the reality that his wife had let her drunk lover and his friend back into the house"; and the evidence did not compel a conviction of murder in the first degree on the ground of extreme atrocity or cruelty. There was ample evidence to support the conviction and the theory of extreme atrocity or cruelty. See *Commonwealth* v. *Anderson*, 408 Mass. 803, 810 (1990), and cases cited. The murder was brutal and "committed with utter disregard for human decency and life." *Commonwealth* v. *Hogan*, 426 Mass. 424, 435 (1998).

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*